**ALASKA TEXTILE CO., INC.,**
**Plaintiff–Appellant,**

v.

**CHASE MANHATTAN BANK,**
**N.A., Defendant–Appellee.**

**No. 263, Docket 92–7468.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1992.
Decided Dec. 28, 1992.

Brett J. Meyer, New York City (David H. Relkin, Kreindler & Relkin, P.C., of counsel), for appellant.

Andrew S. O'Connor, New York City (James A. Batson, Liddle, O'Connor, Finkelstein & Robinson, of counsel), for appellee.

Before: ALTIMARI and McLAUGHLIN, Circuit Judges, and WARD, District Judge.[*]

McLAUGHLIN, Circuit Judge:

This is a case of first impression requiring us to determine how a letter of credit issuer's duties under the *Uniform Customs and Practices for Documentary Credits*, Int'l Chamber of Commerce Pub. No. 400 (1983 Revision) (the "UCP" or "Uniform Customs"), are affected by a beneficiary's presentation of documents "on an approval basis."

Alaska Textile Co. sued Chase Manhattan Bank in the United States District Court for the Southern District of New York (Metzner, *J.*) for wrongful dishonor of two letters of credit that Chase had issued

---

[*] Honorable Robert J. Ward, United States District Judge for the Southern District of New York, sitting by designation.

in favor of Alaska. Alaska conceded that its documents did not conform to the credits, but argued that Chase should be precluded from relying on the discrepancies because Chase violated the timely notice provisions of UCP Article 16(c). *See* UCP art. 16(e) (issuer violating art. 16(c) "shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit"). The district court granted judgment for Chase, holding that Alaska had waived Chase's compliance with Article 16(c) by submitting documents "on an approval basis." *Alaska Textile Co. v. Lloyd Williams Fashions, Inc.*, 777 F.Supp. 1139 (S.D.N.Y.1991). We now affirm, not on a waiver theory, but on the ground that Chase acted on Alaska's demand for payment on the credits within the "reasonable time" mandated by Article 16(c).

## BACKGROUND

A brief description of what a letter of credit is and how it works may illuminate the discussion. Suppose that B, a Japanese buyer, wants to buy cloth from S, a New York seller. S does not know B and is reluctant to ship the cloth to Japan on credit, with no solid assurance that B will ever pay him.

To allay S's concerns, B may arrange to have a bank issue an irrevocable letter of credit in favor of S. S may then ship the cloth to Japan, secure in his own mind that he will be paid by the bank. The commercial letter of credit, then, is a common payment mechanism in international trade that permits the buyer in a transaction to substitute the financial integrity of a stable credit source (usually a bank) for his own.

In its classic form, the letter of credit is only one of three distinct relationships between three different parties: (1) the underlying contract for the purchase and sale of goods between the buyer ("account party") and the seller ("beneficiary"), with payment to be made through a letter of credit to be issued by the buyer's bank in favor of the seller; (2) the application agreement between the bank and the buyer, describing the terms the issuer must incorporate into the credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3) the actual letter of credit which is the bank's irrevocable promise to pay the seller-beneficiary when the latter presents certain documents (*e.g.*, documents of title, transport and insurance documents, and commercial invoices) that conform with the terms of the credit. *See generally First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y.2d 287, 294–95, 486 N.Y.S.2d 715, 718–19, 475 N.E.2d 1255, 1258–59 (1985); Henry Harfield, *Who Does What to Whom: The Letter of Credit Mechanism*, 17 UCC L.J. 291, 292–94 (1985).

The great utility of the letter of credit derives from the fact that these three relationships are utterly independent of one another:

> The fundamental principle governing documentary letters of credit and the characteristic which gives them their international commercial utility and efficacy is that the obligation of the issuing bank to honour a draft on a credit when it is accompanied by documents which appear on their face to be in accordance with the terms and conditions of the credit is independent of the performance of the underlying contract for which the credit was issued.

*Bank of Nova Scotia v. Angelica–Whitewear Ltd.*, 36 D.L.R.4th 161, 166 (Sup.Ct. Can.1987), *quoted in* John F. Dolan, *Documentary Credit Fundamentals: Comparative Aspects*, 3 Bank. & Fin.L.Rev. 121, 127 (1989); *see also Marino Ind. Corp. v. Chase Manhattan Bank, N.A.*, 686 F.2d 112, 115 (2d Cir.1982) ("It is the complete separation between the underlying commercial transaction and the letter of credit that gives the letter its utility in financing transactions."); *First Commercial Bank*, 64 N.Y.2d at 294, 486 N.Y.S.2d at 719, 475 N.E.2d at 1259 ("The fundamental principle governing [letter of credit] transactions is the doctrine of independent contracts."). This independence principle infuses the credit transaction with the simplicity and certainty that are its hallmarks. The letter of credit takes on a life of its own as

manifested by the fact that, "[i]n credit operations all parties concerned deal in documents, not in goods, services, and/or other performances to which the documents may relate." UCP art. 4; *accord* U.C.C. §§ 5–109 & 5–114(1); *United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 259, 392 N.Y.S.2d 265, 270, 360 N.E.2d 943, 948 (1976).

Because the credit engagement is concerned only with documents, "the terms and conditions of a letter of credit must be strictly adhered to...." *Corporacion De Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 47 (2d Cir.1979). "There is no room for documents which are almost the same, or which will do just as well." *Equitable Trust Co. v. Dawson Partners*, [1927] Lloyd's List L.R. 49, 52 (1926) (appeal taken from Eng.C.A.), *quoted in Supreme Merchandise Co. v. Chemical Bank*, 70 N.Y.2d 344, 352, 520 N.Y.S.2d 734, 738, 514 N.E.2d 1358, 1362 (1987). "This rule [of strict compliance] finds justification in the bank's role in the transaction being ministerial, and to require it to determine the substantiality of discrepancies would be inconsistent with its function." *United Commodities–Greece v. Fidelity Int'l Bank*, 64 N.Y.2d 449, 455, 489 N.Y.S.2d 31, 33, 478 N.E.2d 172, 173 (1985) (citations omitted). Issuers are likewise held to rigorous standards. If the documents do comply with the terms of the credit, the issuer's duty to pay is absolute, regardless of whether the buyer-account party complains that the goods are nonconforming. Issuers, moreover, must swiftly and carefully examine documents submitted for payment; and they are estopped from complaining about discrepancies they did not assert promptly.

Letters of credit are *sui generis*. Virtually unknown at Roman Law, letters of credit were woven into the fabric of the common law, largely under the aegis of Lord Mansfield as he fashioned the law merchant (*lex mercatoria*) to the needs of the 18th Century Industrial Revolution. Although they share certain characteristics of contracts, negotiable instruments, and guarantees, *see* Henry Harfield, Letters of Credit 1–2 (1979), letters of credit have "evolved as a mercantile specialty entirely separate from common law contract concepts and they still must be viewed as entities unto themselves." *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir.1983); *see also* U.C.C. § 5–101 official comment (Article 5 established "to set an independent theoretical frame for the further development of letters of credit"). Thus, letters of credit are governed by the *lex mercatoria*, *see* John F. Dolan, The Law of Letters of Credit ¶ 2.02, at 2–5 (2d ed. 1991); Harfield, Letters of Credit, *supra*, at 1; Rufus J. Trimble, *The Law Merchant and the Letter of Credit*, 61 Harv.L.Rev. 981 *passim* (1948), and, in applying this body of law, we are appropriately solicitous of the necessities of commerce and of developments in other jurisdictions.

These developments are embodied in the UCP, a compilation of internationally accepted commercial practices,[1] first issued in 1930 by the International Chamber of Commerce and revised approximately every ten years since. *See generally* Frans P. de Rooy, Documentary Credits 10–11 (1984). The UCP enjoys a unique status. Although it is not law, the UCP applies to most letters of credit (including the ones at issue in this case) because issuers generally incorporate it into their credits, *see* Lazar Sarna, Letters of Credit 54–55 (2d ed. 1986) ("most issuing banks today make express reference to the [UCP]"); Henry Harfield, *Code Treatment of Letters of Credit*, 48 Cornell L.Q. 92, 96 (1962) ("all of the banks in New York which do any letter of credit business have, over the years, and as a matter of course, subjected their letters of credit to the [UCP]"); and the New York Uniform Commercial Code expressly provides that it "does not apply to a letter of credit or a credit if by its terms or by agreement, course of dealing or usage of trade such letter of credit or credit is sub-

---

**1.** Over 140 countries use the Uniform Customs. *See* 6 Letter of Credit Update 1, 29–37 (Dec. 1990).

ject in whole or in part to the [UCP]." N.Y.U.C.C. § 5–102(4) (McKinney's 1991).

## FACTS

Plaintiff-appellant Alaska Textile Co., which is owned and operated by Amnon Kashi, is a New York-based textile company that exports fabric from India. Lloyd Williams Fashions, Inc. ("Lloyd"), a manufacturer of women's clothing, contracted with Alaska in early 1988 to buy several thousand yards of Indian silk which were to be delivered to Lloyd's facility in Hong Kong. To make payment, Lloyd arranged for defendant-appellee Chase Manhattan Bank to issue two letters of credit in favor of Alaska, for $82,500 and $47,141.25, respectively.

The silk was shipped from India to Hong Kong on April 2, 1988, but Alaska, the shipper, did not forward the necessary documents to its collecting bank,[2] Merchants Bank of New York, until April 26, 1988. Merchants's letter of credit examiner—known as Junior to all involved in this litigation—reviewed Alaska's documents and noted three discrepancies: (1) the documents were stale, *i.e.*, presented more than twenty-one days after the goods had been shipped, *see* UCP art. 47(a); (2) the description of goods did not strictly conform to the credits; and (3) the airway bill lacked a "notify party" designation. Junior informed Alaska of these discrepancies, at least one of which, late presentation, was incurable. Undeterred, Alaska directed Merchants to present the discrepant documents to Chase anyway "as is, with discrepancies."

Merchants presented the documents and a form collection letter to Chase the very next day. Under a space on the form denominated "SPECIAL INSTRUCTIONS," Merchants typed, "Documents are presented on an approval basis." The district court found that this is an industry-accept-

ed phrase used "to indicate that discrepancies in the documents existed, and that Alaska was asking Chase to request Lloyd to waive these discrepancies and authorize payment." 777 F.Supp. at 1140.

Chase examined the documents corresponding to the two letters of credit, respectively, on the third and fourth banking days following presentment. Chase noted discrepancies in the documents that justified dishonor, promptly advised Lloyd of the discrepancies, and asked whether it would waive them. While Lloyd was considering whether to waive the discrepancies, Kashi contacted Lloyd's president to persuade him to authorize payment under the credits. Over the next two weeks, Alaska and Lloyd, both in desperate financial condition, continued to negotiate over payment for the silk.

In the meantime, on May 9, 1988 (eight banking days after presentment), Chase told Junior at Merchants Bank that there were discrepancies in the documents which justified dishonor, but that Lloyd had not yet decided whether to waive them. When Chase asked how to proceed, Junior essentially instructed Chase to sit on the documents, pending Lloyd's decision whether to authorize payment. Chase sent a telex to Merchants Bank on May 18, 1988, restating the discrepancies justifying dishonor and stating that the documents were being held at Alaska's disposal. The record does not indicate whether Chase sent the telex at Alaska's or Lloyd's behest.

In September 1988, Alaska sued Chase in New York Supreme Court for wrongful dishonor of the letters of credit. Chase removed the action to federal court, and the case was tried before Judge Metzner. Kashi, Junior, and Chase's letter-of-credit examiner testified, and each side presented expert testimony regarding standard banking practice and Chase's obligations under the UCP. It was undisputed that Alaska's

---

**2.** Alaska erroneously characterizes Merchants as an "advising bank." Although both advising banks and collecting banks are correspondent banks, they perform different functions. The advising bank is an agent of the issuer and the account party, *see Sound of Market St., Inc. v. Continental Bank Int'l,* 819 F.2d 384, 388 (3d

Cir.1987) (applying New York law), and "gives notification of the issuance of a credit by another." U.C.C. § 5–103(1)(e). A collecting bank, in contrast, acts as an agent of the beneficiary for the purposes of presenting the documents and receiving payment thereon. Raymond Jack, Documentary Credits 129 (1991).

documents were discrepant and, therefore, that Alaska was not entitled to payment under the credits if Chase was permitted to rely on the discrepancies. Alaska argued, however, that because Chase had violated Article 16's timely notice provisions, it was precluded by UCP Article 16(e) from asserting that the documents were discrepant. Judge Metzner disagreed, holding that Alaska had waived Chase's compliance with Article 16(c) by submitting documents "on an approval basis." *See* 777 F.Supp. at 1141. He therefore entered judgment for Chase dismissing Alaska's complaint.

## DISCUSSION

■ We begin with the only point upon which the parties and the district court agree—the meaning of the phrase "presented on an approval basis." It is an "industry accepted phrase ... indicat[ing] that discrepancies in the documents existed, and that Alaska was asking Chase to request Lloyd to waive these discrepancies and authorize payment." 777 F.Supp. at 1140; *see also id.* at 1141 (by submitting documents on an approval basis, "Alaska was asking Chase to refrain from exercising its right to reject the discrepant documents immediately after inspection, and instead to request the customer's waiver of the discrepancies"). Neither party disputes this *factual* finding, which was supported by the testimony of their expert witnesses.

The parties and the district court, however, have vastly different views about the *legal* implications of submitting documents on an approval basis: the district court intimated that Chase may have violated Article 16(c)'s timely notice provisions but held that Alaska "ha[d] waived its right to strict compliance with UCP's Article 16(c)" by submitting documents on an approval basis. 777 F.Supp. at 1141. Chase eschews a waiver analysis, arguing instead that Article 16(c) is not even applicable to presentations made on an approval basis.

The UCP says nothing about presentations made on an approval basis. Nor does any reported decision, or scholarly authority, of which we are aware. Nonetheless, presentation of documents "on an approval basis"—as that phrase was defined by the district court—is the functional equivalent of presentation "on a collection basis" under a letter of credit; and there is persuasive, albeit scant, authority construing the latter terminology.

Presentation of documents "on a collection basis" *under a letter of credit* has the same meaning as "on an approval basis," indicating that payment is sought from the bank as principal under the letter of credit. Depending on the circumstances, however, "on a collection basis" can indicate that the documents are being sent on a basis independent of the letter of credit, *i.e.*, for simple collection under the Uniform Rules for Collections, Int'l Chamber of Commerce Pub. No. 322 (1978) ("Collections Rules"), with the bank acting as the beneficiary's agent by delivering the documents to the account party against payment:

Documents which are known not to conform to the credit are sometimes sent to the issuing bank ... "on a collection basis" or "for collection". Such phrases are themselves ambiguous, and their meaning must be obtained from the context. The meaning may be that the documents are sent on the basis that they are being presented under the credit with what is in effect a request for the waiver of the discrepancies, such as that they be accepted out of time. In such a case the Uniform Customs will apply, and if the documents are accepted all the obligations of the issuing bank ... will become effective. Or it may be that the documents are being sent on a basis independent of the credit (or, it may be said, outside it), namely for simple collection, the bank probably being made the agent of the party sending them to collect on them from the buyer if the buyer is prepared to take them. In such a case the [International Chamber of Commerce's] Uniform Rules for Collections are likely to apply. It appears that, if the correspondence shows that the presentation is being made under the credit, it will fall into the former category.

Jack, *supra* note 2, at 101 (footnotes omitted); *see also* de Rooy, *supra*, at 155 (discussing the issuer's seeking payment for the documents as the beneficiary's agent).

As described by Judge Jack, then, it is clear that submission of documents "on a collection basis" *under a letter of credit* (versus Collections Rules) is equivalent to presentation "on an approval basis," and this characterization is supported by the record. Junior testified that by submitting the documents "on an approval basis," Merchants, as agent for Alaska, was presenting the documents for payment under the two letters of credit. Although apparently oblivious that "on a collection basis" was susceptible of two meanings, Chase's letter-of-credit examiner likewise testified that "[on an approval basis] was taken to mean the same thing as on a collection basis." Chase's expert, Derek Kennedy, conceded that the documents were "submitted under the letter of credit so that the bank [could] examine the documents under the rules on which the letter of credit was issued, the UCP," although he argued that Article 16(c) did not apply. In sum, submission of documents on an approval basis is equivalent to submitting documents on a collection basis under a letter of credit.

*Applicability of Article 16*

■ Chase's position that UCP Article 16(c) does not apply to presentations made on an approval basis is contradicted by *Harlow & Jones Ltd. v. American Express Bank Ltd.*, [1990] 2 Lloyd's Rep. 343 (Q.B.), a wrongful dishonor case in which the plaintiff-beneficiary had presented discrepant documents "on a collection basis." The defendant-issuer argued that " 'on a collection basis' ... meant that the documents were to be sent to the issuing bank outside the letter of credit, the issuing bank being authorized to act simply as a collecting agent without any further responsibility for payment...." *Id.* at 347–48. The Commercial Court rejected this contention, holding:

> These then were the clear instructions which the issuing bank received with the documents, and they admit of only one possible meaning: namely, that the docu-

ments were forwarded under the letter of credit; that the issuing bank was to decide, no doubt in consultation with its customer, whether or not the documents were acceptable to it under the terms of the letter of credit; and, in either event, what consequences were to follow. *The process was, of course, that required by art. 16 of the UCP.*

*Id.* at 346 (emphasis added); *see also Michael Doyle & Assocs. Ltd. v. Bank of Montreal*, 140 D.L.R.3d 596 (Sup.Ct.B.C. 1982) (rejecting confirming bank's claim that beneficiary waived its claim under letter of credit by agreeing to submission on a collection basis). *Compare Merchants Bank of New York v. Credit Suisse Bank*, 585 F.Supp. 304, 306–07 (S.D.N.Y.1984) ("irrevocability of the letter of credit had been destroyed once it became a collection item" following issuer's proper rejection of documents under Article 16).

This case presents the same core facts as *Harlow & Jones:* Alaska submitted documents under—not outside—the letters of credit. And, although the documents were admittedly discrepant, Alaska hoped that Lloyd would nonetheless accept them and authorize payment under the credits. Thus, we agree with *Harlow & Jones* that the UCP, including Article 16 in its entirety, applied to Alaska's presentation of documents for payment under the credits. Indeed, that the UCP governs presentations on an approval basis is even clearer here than when the beneficiary submits documents on a collection basis under a letter of credit because the latter terminology is inherently ambiguous by virtue of its use of the word "collection," which could be taken to refer to the Collections Rules. *See, e.g., Merchants Bank*, 585 F.Supp. at 306–07.

This determination is amply supported by the record. Both Junior and Alaska's expert testified that submission of documents on an approval basis neither removed the transaction from the UCP generally, nor from Article 16(c) specifically. But the testimony of Chase's own credit examiner also does not support its contention that Alaska rendered Article 16(c) nugatory by presenting documents on an approval basis. Although she testified that the bank treated

820

such documents differently than it would in an ordinary credit transaction, she could not say that the UCP or Article 16 did not apply, or that the bank was not obligated to act on the documents within a "reasonable time." In fact, she conceded that Chase's obligations "remain[ed] as set forth in the UCP." Thus, the parties to the letters of credit did not understand that Alaska, by submitting documents on an approval basis, had removed the applicability of Article 16(c).

■ This conclusion likewise counsels against a finding that Alaska waived Chase's compliance with Article 16(c) by submitting documents on an approval basis. "To establish waiver under New York law one must show that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." *Voest–Alpine,* 707 F.2d at 685 (collecting citations); *see also United Commodities–Greece,* 64 N.Y.2d at 457, 489 N.Y.S.2d at 34, 478 N.E.2d at 175. Even assuming that Alaska had knowledge of its rights under Article 16(c), the record will not support a finding that it intended to relinquish those rights.

The district court premised its conclusion that Alaska had waived Chase's compliance with Article 16(c) on two facts: (1) Alaska submitted its documents on an approval basis, and (2) Kashi urged Lloyd to waive the discrepancies. As we have already noted, however, a presentation of documents on an approval basis is made under a letter of credit and, therefore, the UCP—including Article 16(c)—applies. *See Harlow & Jones,* [1990] 2 Lloyd's Rep. at 346. That Alaska itself requested Lloyd to waive the discrepancies is also insufficient to support a finding of waiver. This plea was no different from Alaska's request that Chase ask Lloyd to waive; and neither is necessarily inconsistent with Alaska's rights (more accurately, Chase's obligations) under Article 16(c). *Compare United Commodities–Greece,* 64 N.Y.2d at 457, 489 N.Y.S.2d at 34, 478 N.E.2d at 175 ("This is not a case in which, for example, a bank, knowing that documents were nonconforming, nonetheless, and after so informing

the presenter, accepted the documents and paid on the letter, thus intentionally and knowingly relinquishing its right to strict compliance.").

Where, as here, a beneficiary presents documents under letters of credit that expressly incorporate the UCP as a template of rights and responsibilities, courts should be chary about altering the parties' relationship based on equitable doctrines such as waiver. *See Voest–Alpine,* 707 F.2d at 685; *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 241–42 (5th Cir.1983) (Goldberg, J., dissenting); *Paramount Export Co. v. Asia Trust Bank, Ltd.,* 193 Cal.App.3d 1474, 238 Cal.Rptr. 920, 925–26 (Cal.Ct.App.1987); Dolan, The Law of Letters of Credit, *supra,* ¶ 6.02, at 6–4 to 6–5. " 'The financial value of the letter of credit promise is predicated upon its degree of legal certainty.' " *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 16 (2d Cir.1979) (quoting Boris Kozolchyk, Commercial Letters of Credit in the Americas § 18.04[1], at 394–95 (1966)) (vacating preliminary injunction restraining issuer from paying on a letter of credit). Equity's heralded virtue—that it is administered with regard to fairness, as opposed to the rigid rules of the common law—has but a limited role in a credit engagement that demands certainty and predictability if it is to continue its vital role in facilitating international commerce. Accordingly, we will require a significant showing before we deem parties to a letter of credit to have waived its express terms. That showing has not been made here.

Having determined that Article 16 applied to these transactions and that Alaska had not waived Chase's adherence to Article 16(c), we must now consider whether Chase complied with that provision.

*"Reasonable Time" Under UCP Article 16(c)*

■ The UCP provides that "[t]he issuing bank shall have a reasonable time in which to examine the documents and to determine, as above, whether to take up or to refuse the documents." UCP art. 16(c). If the issuer does not act in accordance with this provision, it "shall be precluded

from claiming that the documents are not in accordance with the terms and conditions of the credit," UCP art. 16(e), *i.e.*, it must honor the credit.

Alaska asserts that, in construing "reasonable time" under the UCP, courts have generally equated it with the Uniform Commercial Code's ("UCC" or "Code") requirement that the issuer act within three banking days,[3] U.C.C. § 5–112(1). *See An Examination of U.C.C. Article 5 (Letters of Credit)*, Report of the Task Force of the Letter of Credit Subcommittee of the U.C.C. Committee, Business Law Section of the American Bar Association XI (James Byrne chair. Sept. 29, 1989), *reprinted in* 45 Bus.Law. 1521, 1600 (1990) ["Task Force Report"] ("Some courts have bridged the difference between the U.C.C.'s rigid rule and the reasonable time rule of the U.C.P. by finding that three days constituted a reasonable time."); *see, e.g., Banque De L'Union Haitienne, S.A. v. Manufacturers Hanover Int'l Banking Corp.*, 787 F.Supp. 1416, 1421 (S.D.Fla.1991), *aff'd*, 959 F.2d 971 (11th Cir.1992); *Occidental Fire & Casualty Co. v. Continental Ill. Nat'l Bank & Trust Co.*, 718 F.Supp. 1364, 1371 *and* 725 F.Supp. 383, 387–88 (N.D.Ill. 1989), *aff'd*, 918 F.2d 1312 (7th Cir.1990); *Offshore Trading Co. v. Citizens Nat'l Bank*, 650 F.Supp. 1487, 1491 (D.Kan. 1987); *Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1542 (S.D.N.Y.1985), *aff'd on other grounds*, 808 F.2d 209 (2d Cir.1986); *Price & Pierce Int'l, Inc. v. Cimex U.S.A. Inc.*, No. 80–21224 (N.Y.Sup.Ct. Dec. 12, 1986), *reprinted in* 3 Letter of Credit Update 35, 42 (July 1987), *aff'd without opinion sub nom., Price & Pierce Int'l, Inc. v. Hanil Bank Ltd.*, 136 A.D.2d 977, 523 N.Y.S.2d 333 (1st Dept.), *app. denied*, 72 N.Y.2d 803, 532 N.Y.S.2d 369, 528 N.E.2d 521 (1988); *First Nat'l Bank v. Carmouche*, 504 So.2d 1153, 1158–59 (La.Ct.App.), *rev'd on other grounds*, 515 So.2d 785 (La.1987). *But see, e.g., Occidental Fire*, 918 F.2d at 1318 n. 3 ("it is entirely possible that the UCP would allow an issuing bank more than three business days to review draw documents under some circumstances"); *Integrated Measurement Sys., Inc. v. International Commercial Bank*, 757 F.Supp. 938, 947 (N.D.Ill.1991) (same); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 545 F.Supp. 301, 305 (S.D.N.Y.1982) (suggesting that three to five days is reasonable), *aff'd in part and rev'd in part on other grounds*, 707 F.2d 680 (2d Cir.1983); *Morgan Guaranty Trust Co. v. Vend Technologies, Inc.*, 100 A.D.2d 782, 783, 474 N.Y.S.2d 67, 68 (1st Dept.1984) (per curiam) (suggesting that four days would be reasonable); *Waidmann v. Mercantile Trust Co. Nat'l Ass'n*, 711 S.W.2d 907, 916 (Mo.Ct.App.1986) ("What constitutes a reasonable time for taking action depends upon the nature and circumstances of the situation."); Dolan, *Documentary Credit Fundamentals, supra*, at 137–38 ("U.S. authority suggests that from 3 to 5 days is a reasonable period"); Raymond Jack, *Documentary Credits: Article 16 Uniform Customs and Rejection of Documents: The Bankers Trust Case*, Butterworth's J. of Int'l Bank. & Fin.L. 484, 486 (Oct. 1991) (three-day period is a guideline, not a rule). We expressly avoided ruling on this contention in *Bank of Cochin*, 808 F.2d at 213 ("we need not decide whether a three-day time period should be read into the UCP's Article [16(c)] reasonable time requirement"); *see also Auto Servicio San Ignacio, S.R.L. v. Compania Anonima Venezolana de Navegacion*, 765 F.2d 1306, 1310 (5th Cir.1985) (similarly avoiding the issue), but we now reject it.

Courts that bother to offer a rationale for the proposition that "reasonable time" cannot exceed three days generally adopt

---

**3.** We note the Code's three-day limit will likely be revised. Article 5 is being overhauled, and section 5–112 will probably be brought in line with the UCP, which is undergoing its decennial revision. *See UCC Revised Article 5, § 112(a) & comment 1, Nat'l Conf. of Commissioners on Unif. State Laws (Jan. 28, 1992 draft)* ["Revised Article 5"] (providing for "a reasonable time, not to exceed seven business days" "in an attempt to conform the statute to the proposed rules under the UCP"); *see also* James E. Byrne, *Point-by-Point Commentary, UCC Article 5 Revision Draft*, 8 Letter of Credit Update 16, 18–19 (June 1992) (commenting on an earlier version of revised § 5–112).

the reasoning of the district court in *Bank of Cochin:*

> Neither the 1983 UCP nor the 1974 UCP defines what constitutes a "reasonable time" to determine if the documents are defective.... When the UCP is silent or ambiguous, analogous UCC provisions may be utilized if consistent with the UCP. The UCC provides for a period of three banking days for the issuer to honor or reject a documentary draft for payment.... The "reasonable time" three-day period should be the maximum time allowable for the notification ... requirement.

*Bank of Cochin*, 612 F.Supp. at 1542–43 (citations omitted), *followed in Banque De L'Union*, 787 F.Supp. at 1421; *Price & Pierce, supra,* at 42.

We need not enmesh ourselves in the controversy regarding the interplay of the UCP and UCC under New York law,[4] however, because we find Article 16(c) to be neither silent nor ambiguous: it explicitly provides that issuers shall have a *reasonable time* to act on a beneficiary's presentation of documents for payment. That "reasonable time" may be imprecise neither makes it ambiguous nor invites interpolation of a fixed time period. In fact, the International Chamber of Commerce gave "[c]onsiderable thought ... to the possibility of replacing 'reasonable time' [with] a specific period of time," but rejected the suggestion. Bernard S. Wheble, *UCP 1974/1983 Revisions Compared and Explained,* Int'l Chamber of Commerce Pub. No. 411, at 33 (1984): *see also* Robert M. Rosenblith, *Lawyer Robert M. Rosenblith Looks at UCC Provisions Against UCP Rule,* 6 Letter of Credit Update 11 (Feb. 1990) ("there is a disparity of opinion on the question of what is a 'reasonable time' which precluded international consensus of a particular period").

Equating the UCP's "reasonable time" with the UCC's three-day limit for examining documents also ignores the contexts in which these provisions appear. The Code and the Uniform Customs adopt vastly different approaches to demands under letters of credit that are not promptly and finally honored. *See Bankers Trust Co. v. State Bank of India,* [1991] 2 Lloyd's Rep. 443, 448 (A.C.) (UCC three-day limit "is not exactly analogous [to the UCP], since documents are deemed to be rejected [under the UCC], unless they are accepted within three clear banking days, not the other way round"). *See generally* James G. Barnes, *Nonconforming Presentations Under Letters of Credit: Preclusion and Final Payment,* 56 Brooklyn L.Rev. 103, 103–107 (1990) (contrasting UCP and UCC treatment of issuer's responsibilities and beneficiary's remedies for breach); *Rosenblith, supra,* at 11–12 (same).

Under UCP Article 16(e), if an issuer does not dishonor a demand for payment within a reasonable time, it is deemed to have honored it, whether or not the documents actually conform to the terms of the credit. Thus, in an action for wrongful dishonor, the beneficiary can invoke this rule of strict preclusion to estop the issuer from relying on the documents' nonconformity—regardless of whether the beneficiary has demonstrated detrimental reli-

---

**4.** *Compare Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.,* 748 F.Supp. 177, 181 (S.D.N.Y.1990) ("analogies to the NY–UCC may be drawn where the two bodies of law are not in conflict"); *Cambridge Sporting Goods,* 41 N.Y.2d at 259 n. 2, 392 N.Y.S.2d at 270 n. 2, 360 N.E.2d at 948 n. 2 ("even if the [UCP] were deemed applicable to this case, it would not, in the absence of a conflict, abrogate the precode case law (now codified in [UCC] § 5–114) and that authority continues to govern even where article 5 is not controlling") (*dictum*); *and Prutscher v. Fidelity Int'l Bank,* 502 F.Supp. 535, 536–37 (S.D.N.Y. 1980) (applying UCC § 5–114 to credit governed by UCP; citing *Cambridge Sporting Goods*) *with Fertico Belgium, S.A. v. Phosphate Chems. Export Ass'n,* 100 A.D.2d 165, 167, 473 N.Y.S.2d 403, 405 (1st Dept.1984) ("since the letter of credit was subject to the UCP, article 5 of the [UCC] ... does not apply"); *Capehart Corp. v. Shanghai Commercial Bank, Ltd.,* 49 A.D.2d 521, 522, 369 N.Y.S.2d 751, 752 (1st Dept.1975) (per curiam) (reversing denial of summary judgment based on UCC § 5–114 because UCP applied); *and Hohenberg Co. v. Comitex Knitters, Ltd.,* 104 Misc.2d 232, 233, 428 N.Y.S.2d 156, 157 (Sup.Ct. N.Y.Cty.1980) ("under subdivision (4) of Section 5–102 of the [UCC], the [UCP] alone controls"). *See generally* Dolan, The Law of Letters of Credit, *supra,* ¶ 4.05, at 4–19 to 4–21; Harfield, *Code Treatment, supra,* at 95–97.

ance. *See, e.g., Kerr–McGee Chemical Corp. v. FDIC,* 872 F.2d 971, 974 (11th Cir.1989); *Bank of Cochin,* 808 F.2d at 212; *Kuntal, S.A. v. Bank of New York,* 703 F.Supp. 312, 313–14 (S.D.N.Y.1989); *Datapoint Corp. v. M & I Bank of Hilldale,* 665 F.Supp. 722, 727 (W.D.Wis.1987); *Price & Pierce, supra,* at 42–43.

An issuer that does not comply with the Code's rigid three-day limitation, however, is deemed to have *dishonored* the demand for payment, *see* U.C.C. § 5–112(1); *see also* Rosenblith, *supra,* at 12 ("Dishonor has a host of implications with possible severe consequences on the account party (even the beneficiary) which will ultimately be sought to be visited on the issuer."); but "the issuer who dishonors by inaction [under the UCC] may raise nonconformity as a defense in the beneficiary's subsequent action for wrongful dishonor." Barnes, *supra,* at 104; Only if the beneficiary can satisfy the traditional requirements for estoppel (*e.g.,* detrimental reliance) can it prevail on a wrongful dishonor claim if its documents were nonconforming. *See, e.g., American Coleman Co. v. Intrawest Bank of Southglenn, N.A.,* 887 F.2d 1382, 1387 (10th Cir.1989); *see also* Dolan, The Law of Letters of Credit, *supra,* ¶ 4.06[2][c], at 4–30 ("Uniform Customs appear to fashion a strict estoppel rule, while the common-law cases require the beneficiary to establish the traditional elements of common-law estoppel"). In fact, under the UCC, regardless of the issuer's dilatory behavior, a beneficiary that knowingly presents nonconforming documents may not recover for wrongful dishonor. *See, e.g., Pro-Fab, Inc. v. Vipa, Inc.,* 772 F.2d 847, 855 (11th Cir.1985); *Philadelphia Gear,* 717 F.2d at 238; *see also Delta Brands, Inc. v. MBank Dallas, N.A.,* 719 S.W.2d 355, 359 (Tex.Ct.App.1986) (issuer may recover payment from beneficiary under letter of credit where beneficiary's documents were discrepant and account party refused to reimburse issuer). *Compare Habib Bank Ltd. v. Convermat Corp.,* 145 Misc.2d 980, 982, 554 N.Y.S.2d 757, 759 (App.Term 1st Dept.1990) (per curiam) ("Plaintiff cannot invoke the [UCC] to assert a claim which has been precluded under the UCP because plaintiff, as issuing bank, failed to assert the noncompliance of documents in a timely fashion."). Thus, the consequences of an issuer's untimely action on a beneficiary's demand for payment are significantly different under the Code and Uniform Customs.

Finally, those that would incorporate the three-day period of UCC section 5–112(1)(a) into UCP Article 16(c) disregard subdivision (b) of section 5–112(1), which provides that the issuer may "further defer honor if the presenter has expressly or impliedly consented thereto." This provision has the salutary effect of tempering the rigid three-day rule, yet no one has suggested that it too should be incorporated into Article 16(c). Thus, were we to accept the argument that "reasonable time" really means three days, the issuer would be left with an absolute duty to act within three days, without exception, and violation of this duty would bring down on the issuer the penalty of strict preclusion. *See* Task Force Report, *supra,* at 1603 ("fixed three day banking rule coupled with an automatic preclusion rule ... would impose an unduly harsh burden on issuers"). This "rule" bastardizes both the Code and the Uniform Customs, producing a result that resembles neither. We reject it.

■ "Reasonable time" is a term of art with well-developed implications in the law. What constitutes a reasonable time necessarily depends upon the nature, purpose, and circumstances of each case. *See Zev v. Merman,* 73 N.Y.2d 781, 782, 536 N.Y.S.2d 739, 739–40, 533 N.E.2d 669, 669 (1988); *Knight v. McClean,* 171 A.D.2d 648, 650, 566 N.Y.S.2d 952, 953–54 (2d Dept.1991); *State v. Atlantic Audio–Visual Corp.,* 118 A.D.2d 998, 1001, 499 N.Y.S.2d 995, 997 (3d Dept.1986). In the letter-of-credit context, "what is a 'reasonable time' is to be determined by examining the behavior of those in the business of examining documents, mostly banks." Revised Article 5, *supra,* § 5–112(a) comment 1; *see also Waidmann,* 711 S.W.2d at 916 ("[w]hat constitutes a reasonable time for [the issuer's] taking action depends upon the nature and circumstances of the situation."); *Bankers*

*Trust Co. v. State Bank of India,* [1991] 1 Lloyd's Rep. 587, 600 (Q.B.1990) (art. 16(c) was intended "to require consideration in broad terms whether the issuing bank set about its work conscientiously and, viewed overall, handled the matter with reasonable promptness"), *appeal dismissed,* [1991] 2 Lloyd's Rep. 443 (C.A.).

▉ In this case, Alaska submitted documents with patent, incurable discrepancies and requested that Chase seek a waiver of the discrepancies from Lloyd. Chase examined one set of documents on the third banking day following presentment, and the other set on the fourth day. It informed Lloyd of the discrepancies and, pursuant to Alaska's request, asked Lloyd whether it would waive the discrepancies and authorize payment. At that point, Chase had done all that it could, and the matter was out of its control.

Four banking days later (eight banking days after presentment), Chase informed Merchants of the discrepancies and asked what it should do with the documents. In context, it is clear that Chase was asking whether Alaska wanted Chase to give formal notice of dishonor and to return the documents. Junior demurred and requested that, until he heard otherwise from Alaska, Chase should continue to hold the documents pending Lloyd's decision whether to authorize payment. Fifteen banking days after presentment, Chase sent a telex giving formal notice of dishonor, restating the discrepancies that justified dishonor, and stating that the documents were held at Alaska's disposal.

We hold that Chase acted reasonably under the circumstances. Until either Lloyd decided whether to waive, or Alaska requested action (one way or the other) on its demand for payment, Chase was proceeding as it had been requested, and the matter was out of its control. *See* Jack, Documentary Credits, *supra* note 2, at 87–88 (issuer fulfills his obligation " 'so long as such delay is attributable to causes beyond his control, and he neither has acted negligently nor unreasonably' ") (quoting *Hick v. Raymond and Reid,* [1893] A.C. 22, 29).

To hold otherwise, and thereby impose liability on Chase for credits that were materially discrepant, would create perverse incentives for issuers. A prudent issuer acting on documents submitted on an approval basis would never risk liability by complying with the beneficiary's request that it inquire of the account party regarding waiver. Unless the issuer could secure an immediate waiver, the most sensible course would be to dishonor the demand for payment—a result that none of the participants generally favors.

The letter of credit is intended to grease the wheels of trade and commerce. As many as half of the demands for payment under letters of credit are discrepant, yet, in the vast majority of cases, the account party waives the discrepancies and authorizes payment. *See Bankers Trust,* [1991] 2 Lloyd's Rep. at 456; Revised Article 5, *supra* § 5–112 comment 1; Barnes, *supra,* at 108. This process is efficient, and the law should encourage it, particularly when the beneficiary has acknowledged that its documents are discrepant and has specifically requested that the issuer consult the account party. *See Bankers Trust,* [1991] 1 Lloyd's Rep. at 594; *Co-Operative Centrale Raiffeisen–Boereleenbank B.A. v. Sumitomo Bank Ltd.,* [1987] 1 Lloyd's Rep. 345, 348 (Q.B.1986), *rev'd on other grounds,* [1988] 2 Lloyd's Rep. 250 (C.A.); Dolan, The Law of Letters of Credit, *supra,* ¶ 6.06[1][b], at 6–58 to 6–59.

We acknowledge that this result is not altogether satisfactory because it leaves open the issue of when, having heard neither from the account party nor the beneficiary, the issuer must nevertheless act on the beneficiary's demand for payment. This (unfortunate) uncertainty, however, is the inevitable result of the UCP's acknowledged shortcomings. *See* Jack, *Article 16, supra,* at 486 ("So long as the Uniform Customs provide a reasonable time as opposed to a fixed period, there is bound to be some uncertainty."). *See generally* Vincent M. Maulella, *UCP Art. 16 Proposal on Notifying the Applicant,* 8 Letter of Credit Update 6 (Apr. 1991); *Toward UCP Revision; Article 16 and its Problems,* 6 Letter of Credit Update 6 (May 1990). In

any event, this uncertainty is likely to be short-lived because the newest revision of the UCP, which is to take effect no later than January 1, 1994, provides that an issuer shall have a reasonable time, not to exceed seven banking days following the receipt of documents, to examine the documents and determine whether to accept or reject them. *See* Revised Article 5, *supra,* § 5–112 comment 1; Gerald T. McLaughlin & Neil B. Cohen, *Letter of Credit Law Reform: Part I,* N.Y.L.J., Dec. 9, 1992, at 3, col. 1.

We emphasize how narrow is our holding. It applies only to presentations on an approval basis. It is one thing to say that "reasonable time" cannot—as a matter of law—exceed three banking days. It is quite another to say that—as a matter of fact—three banking days generally constitutes a reasonable time to act on a demand for payment in the ordinary letter-of-credit transaction. Our holding today in no way detracts from the latter proposition, which is amply supported by the case law and literature construing Article 16(c). We are not faced with the ordinary transaction, however, as evidenced by the total lack of authority construing "on an approval basis" and the scant authority interpreting "on a collection basis" under a letter of credit.

## CONCLUSION

When an issuer has explicitly incorporated the Uniform Customs into its letter of credit, we will not absolve it of its obligations under Article 16 without a substantial showing of cause to do so. Merely submitting documents "on an approval basis" is insufficient to displace the provisions of Article 16(c). Because we find that Chase complied with Article 16(c), we affirm the judgment of the district court.