**VOEST–ALPINE TRADING USA CORP., Plaintiff,**

v.

**BANK OF CHINA, Defendant.**

**No. 4:95CV4954.**

United States District Court, S.D. Texas, Houston Division.

March 13, 2000.

---

J. Cary Gray, Looper Reed et al., Houston, TX, for plaintiff.

Christopher Brady, Hollyer Brady Smith Troxell et al., New York City, Louis B. Paine, Jr., Glast Phillips et al., Houston, TX, Marsha Z. Gerber, Glas Phillips et al., Houston, TX, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GILMORE, District Judge.

On February 16 –17 and 21–23, 2000, a bench trial was held in the above-styled case. Having considered the evidence in this case and the applicable law, the Court enters the following findings of fact and conclusions of law.

On June 23, 1995, Plaintiff Voest–Alpine Trading USA Corporation ("Voest–Alpine") entered into a contract with Jiangyin Foreign Trade Corporation ("JFTC") to sell JFTC 1,000 metric tons of styrene monomer at a total price of $1.2 million. To finance the transaction, JFTC applied for a letter of credit through Defendant Bank of China. The letter of credit provided for payment to Voest–Alpine once the goods had been shipped to Zhangjiagang, China and Voest–Alpine had pre-sented the requisite paperwork to the Bank of China as described in the letter of credit. The letter of credit was issued by the Bank of China on July 6, 1995 and assigned the number LC9521033/95. In addition to numerous other typographical errors, Voest–Alpine's name was listed as "Voest–Alpine USA Trading Corp." instead of "Voest–Alpine Trading USA Corp" with the "Trading USA" portion inverted. The destination port was also misspelled in one place as "Zhangjiagng," missing the third "a". The letter of credit did indicate, however, that the transaction would be subject to the 1993 Uniform Customs and Practice, International Chamber of Commerce Publication Number 500 ("UCP 500").

By the time the product was ready to ship, the market price of styrene monomer had dropped significantly from the original contract price between Voest–Alpine and JFTC. Although JFTC asked for a price concession in light of the decrease in market price, Voest–Alpine declined and, through its agents, shipped the styrene monomer on July 18, 1995. All required inspection and documentation was completed. On August 1, 1995, Voest–Alpine presented the documents specified in the letter of credit to Texas Commerce Bank, the presenting bank. Texas Commerce Bank found discrepancies between the presentation documents and the letter of credit which it related to Voest–Alpine. Because Voest–Alpine did not believe that any of the noted discrepancies would warrant refusal to pay, it instructed Texas Commerce Bank to forward the presentation documents to the Bank of China.

Texas Commerce Bank sent the documents via DHL courier to the Bank of China on August 3, 1995. According to the letter of credit, Voest–Alpine, the beneficiary, was required to present the documents within fifteen days of the shipping

date, by August 2, 1995.[1]  As the documents were presented on August 1, 1995, they were presented timely under the letter of credit.  Bank of China received the documents on August 9, 1995.

On August 11, 1995, the Bank of China sent a telex to Texas Commerce Bank, informing them of seven alleged discrepancies between the letter of credit and the documents Voest–Alpine presented, six of which are the subject of this action.  The Bank of China claimed that 1) the beneficiary's name differed from the name listed in the letter of credit, as noted by the presenting bank; 2) Voest–Alpine had submitted bills of lading marked "duplicate" and "triplicate" instead of "original"; 3) the invoice, packing list and the certificate of origin were not marked "original"; 4) the date of the survey report was later than that of the bill of lading; 5) the letter of credit number in the beneficiary's certified copy of the fax was incorrect, as noted by the presenting bank; and 6) the destination was not listed correctly in the certificate of origin and the beneficiary's certificate, as noted by the presenting bank.  The telex further stated.  "We are contacting the applicant of the relative discrepancy [sic].  Holding documents at your risks and disposal."

On August 15, Texas Commerce Bank faxed the Bank of China, stating that the discrepancies were not an adequate basis to refuse to pay the letter of credit and requested that the bank honor the letter of credit and pay Voest–Alpine accordingly.  The telex identified Voest–Alpine as the beneficiary in the transaction.  Voest–Alpine also contacted JFTC directly in an effort to secure a waiver of the discrepancies but was unsuccessful.

On August 19, 1995, the Bank of China sent another telex to Texas Commerce Bank further explaining what it believed to be discrepancies between the letter of credit and the documentation presented by Voest–Alpine according to the UCP 500.  In relevant part, the telex provided:

You cannot say [the discrepancies] are of no consequence.  The fact is that our bank must examine all documents stipulated in the credit with reasonable care, to ascertain whether or not they appear, on their face, to be incompliance [sic] with the terms and conditions of the credit.  According to Article 13 of UCP 500.  An irrevocable credit constitutes a definite undertaking of the issuing bank, providing that the stipulated documents are complied with the terms and conditions of the credit according to Article UCP 500.  Now the discrepant documents may have us refuse to take up the documents according to article 14(B) of UCP 500.

The Bank of China returned the documents to Voest–Alpine and did not honor the letter of credit.

## I.

◼  The commercial letter of credit is a payment device often used in international trade which permits a buyer in a transaction to substitute its financial integrity with that of a stable credit source, usually a bank.  *Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 815 (2d Cir.1992).

"[A letter of credit]  transaction usually comprises three separate contracts: '[f]irst, the issuing bank enters into a contract with its customer to issue the letter of credit.  Second, there is a contract between the issuing bank and the party receiving the letter of credit.  Third, the customer who procured the letter of credit

---

1.  Originally, the Bank of China cited late presentation as one of its reasons for refusing to honor the letter of credit, but has since conceded that Voest–Alpine presented the documents in a timely fashion.

signs a contract with the person receiving it, usually involving the sale of goods or the provision of some service.' " *Resolution Trust Corporation v. Kimball,* 963 F.2d 820, 820 (5th Cir.1992)(quoting *East Girard Sav. Ass'n v. Citizens National Bank, Etc.,* 593 F.2d 598, 601 (5th Cir. 1979)). The underlying principle of the letter of credit transaction is the independence of the three contracts. *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 235 (5th Cir.1983). The issuing bank does not verify that all the terms of the underlying contract have been fulfilled and must pay on a draft properly presented by a beneficiary, without reference to the rights or obligations of the parties to the contract. Tex. Bus. & Comm.Code Ann § 5.108(a), (f)(1) (Vernon's 2000). The issuing bank need only make a facial examination of the presenting documents to determine whether the beneficiary has complied with the terms of the letter of credit, however, the bank bears the risk of any misinterpretation of the beneficiary's demand for payment. Tex. Bus. & Comm. Code Ann. §§ 5.108(i)(4) (Vernon's 2000).

Prior to the amendments to the Texas Business and Commercial Code in 1999, a beneficiary was not required to make its presentation documents strictly comply with the letter of credit, but to present documents that on their face "appear[ed] to comply" with the letter of credit in order to receive payment. Tex. Bus. & Comm.Code Ann. § 5.109(b)(Vernon's 1998); *see also Vest v. Pilot Point Nat'l Bank,* 996 S.W.2d 9, 12 (Tex.Civ.App.1999)(finding that the language in section 5.109 did not mandate strict compliance). The current statutory law requires an issuer to honor a presentation that, as determined by standard practice of financial institutions that regularly issue letters of credit, "appears on its face strictly to comply with the terms and conditions of the letter of credit." Tex. Bus. & Comm.Code Ann. § 5.108(a),(e) (Ver-

non's 2000). Determination of what constitutes standard practice of financial institutions is a "matter of interpretation for the court." Tex. Bus. & Comm.Code Ann. § 5.108(e) (Vernon's 2000).

The Uniform Customs and Practices for Documentary Credits, first issued in 1930 by the International Chamber of Commerce and revised approximately once every ten years since, is a compilation of internationally accepted commercial practices which may be incorporated into the private law of a contract between parties. *Banco General Runinahui, S.A. v. Citibank Int'l,* 97 F.3d 480, 482 (11th Cir.1996)(citing *Alaska Textile,* 982 F.2d at 816). In this case, the parties expressly adopted the UCP 500 as the governing authority in the letter of credit. Where parties explicitly refer to the UCP 500 in their contracts, the UCP has been interpreted to apply to the transaction. *Vest,* 996 S.W.2d at 15. Accordingly, the Court will look to the UCP for guidance in analyzing whether the actions of the Bank of China were in conformity with "standard practice" of financial institutions.

The Bank of China claims that its August 11, 1995 telex to Texas Commerce Bank constituted notice of refusal under the UCP 500 because it contained the required elements listed in Article 14(d). Voest–Alpine argues that the telex did not constitute notice of refusal because there is no clear statement of refusal and because the portion of the telex that indicated that the Bank of China was contacting JFTC to seek a waiver rendered the communication ambiguous.

Article 14(d) of the UCP 500 provides:
    i. If the Issuing Bank ... decides to refuse the [presentation] documents, it must give notice to that effect by telecommunication or, if that is not possible, by other expeditious means, without delay but no later than the close of the

seventh banking day following the day of receipt of the documents. Such notice shall be given to the bank from which it received the documents, or to the Beneficiary, if it received the documents directly from him.

ii. Such notice must state all discrepancies in respect of which the bank refuses the documents and must also state whether it is holding the documents at the disposal of, or is returning them to, the presenter.

INTERNATIONAL CHAMBER OF COMMERCE, ICC UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, ICC PUBLICATION NO. 500 20 (1993).

According to Article 14(d), if the issuing bank elects not to honor the presentation documents, it must provide a notice of refusal within seven banking days of receipt of the documents and the notice must contain any and all discrepancies and state the disposition of the rejected documents. The section requires that if a bank wishes to reject a presentation of documents, it *"must give notice to that effect."* (emphasis supplied).

■ Here, the Bank of China's notice is deficient because nowhere does it state that it is actually rejecting the documents or refusing to honor the letter of credit or any words to that effect. While it is true that under the UCP 500 the notice must contain a list of discrepancies and the disposition of the documents and the Bank of China's telex of August 11, 1995 does indeed contain these elements, this only addresses the requirements of Article 14(d)(ii). A notice of refusal, by its own terms must actually convey refusal, as specified in Article 14(d)(i). This omission is only compounded by the statement that the Bank of China would contact the applicant to determine if it would waive the discrepancies. As Plaintiff's expert, Professor James Byrne, testified, within the framework of Article 14, this additional piece of information holds open the possibility of acceptance upon waiver of the discrepancies by JFTC and indicates that the Bank of China has not refused the documents.

In the August 19, 1995 telex, the Bank of China stated, *"Now* the discrepant documents *may have us refuse* to take up the documents according to article 14(B) of UCP 500" (emphasis supplied). This is the bank's first mention of refusal and it is tentative at best. The use of "now" further indicates that the documents were not previously refused in the August 11, 1995 telex. Even if this second telex was sent as a notice of refusal, it came too late. The Court finds that the evidence establishes that the telex was sent on August 19, 1995. Seven banking days, the refusal period allotted by the UCP 500 Article 14(d), would have expired on August 18, 1995. INTERNATIONAL CHAMBER OF COMMERCE, ICC UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, ICC PUBLICATION NO. 500 21 (1993). Accordingly, the Court finds that the Bank of China did not provide a notice of refusal within seven banking days of receipt of the presentation documents as required by Article 14(d) of the UCP 500. The Bank of China's failure to formally refuse the documents before the deadline precludes the bank from claiming that the documents are not in compliance with the terms and conditions of the credit, according to Article 14(e) of the UCP 500. *Id.* Although the Court could properly conclude its analysis here, the Court will analyze the discrepancies listed by the Bank of China in the August 11, 1995 telex.

## II.

Voest–Alpine claims that the six remaining discrepancies cited by the Bank of China are mere technicalities and typographical errors that do not warrant the rejection of the documents. Voest–Alpine

argues for a "functional standard" of compliance, contending that if the whole of the documents obviously relate to the transaction covered by the credit, the issuing bank must honor the letter of credit. The Bank of China argues that the discrepancies were significant and that if the documents contain discrepancies on their face, it is justified in rejecting them and is not required to look beyond the papers themselves.

Section 13(a) of the UCP 500 provides: Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit. Compliance of the stipulated documents on their face with the terms and conditions of the Credit shall be determined by international standard banking practice as reflected in these Articles. Documents which appear on their face to be inconsistent with one another will be considered as not appearing on their face to be in compliance with the terms and conditions of the Credit.

INTERNATIONAL CHAMBER OF COMMERCE, ICC UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, ICC PUBLICATION NO. 500 19 (1993).

The UCP 500 does not provide guidance on what inconsistencies would justify a conclusion on the part of a bank that the documents are not in compliance with the terms and conditions of the letter of credit or what discrepancies are not a reasonable basis for such a conclusion. The UCP 500 does not mandate that the documents be a mirror image of the requirements or use the term "strict compliance."

The Court notes the wide range of interpretations on what standard banks should employ in examining letter of credit document presentations for compliance. Even where courts claim to uphold strict compliance, the standard is hardly uniform. The first and most restrictive approach is to require that the presentation documents be a mirror image of the requirements. *See Banco General Runinahui, S.A. v. Citibank Int'l,* 97 F.3d 480, 483 (11th Cir. 1996)("This Court has recognized and applied the 'strict compliance' standard to requests for payment under commercial letters of credit ... '[T]he fact that a defect is a mere technicality' does not matter.' ")(quoting *Kerr–McGee Chem. Corp. v. FDIC,* 872 F.2d 971, 973 (11th Cir. 1989)); *Alaska Textile Co. v. Chase Manhattan Bank,* 982 F.2d 813, 816 (2d Cir.1992)(Noting that documents that are nearly the same as those required by the letter of credit are unacceptable for presentation in a letter of credit transaction).

Second, there are also cases claiming to follow the strict compliance standard but support rejection only where the discrepancies are such that would create risks for the issuer if the bank were to accept the presentation documents. *See Flagship Cruises Ltd., v. New England Merchants Nat'l Bank of Boston,* 569 F.2d 699, 705 (1st Cir.1978) ("We do not see these rulings as retreats from rigorous insistence on compliance with letter of credit requirements. They merely recognize that variance between documents specified and documents submitted is not fatal if there is no possibility that the documents could mislead the paying bank to its detriment"); *Crist v. J. Henry Schroder Bank & Trust Co.,* 693 F.Supp. 1429, 1433 (S.D.N.Y. 1988)(where a party who has succeeded by operation of law to the rights of the beneficiary of a letter of credit, refusal was improper, even though the terms of the credit provided for payment only to the beneficiary); *Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Co.,* 612 F.Supp. 1533, 1541 (S.D.N.Y.1985)(even under the strict compliance standard, a variance is permitted between the documents specified in a letter of credit and the documents

presented thereunder where "there is no possibility that the documents could mislead the paying bank to its detriment"); *Vest*, 996 S.W.2d at 14 (noting that strict compliance does not demand "oppressive perfectionism").

A third standard, without much support in case law, is to analyze the documents for risk to the applicant. *See* INT'L CHAMBER OF COMMERCE, COMM'N ON BANKING TECHNIQUE AND PRACTICE, PUBLICATION NO. 511, UCP 500 & 400 COMPARED 39 (Charles del Busto ed.1994) (discussion of a standard that would permit "deviations that do not cause ostensible harm" to the applicant); *see also Breathless Assoc. v. First Savings & Loan Assoc.*, 654 F.Supp. 832, 836 (N.D.Tex.1986)(noting, under the strict compliance standard, "[a] discrepancy ... should not warrant dishonor unless it reflects an increased likelihood of defective performance or fraud on the part of the beneficiary").

The mirror image approach is problematic because it absolves the bank reviewing the documents of any responsibility to use common sense to determine if the documents, on their face, are related to the transaction or even to review an entire document in the context of the others presented to the bank. On the other hand, the second and third approaches employ a determination-of-harm standard that is too unwieldy. Such an analysis would improperly require the bank to evaluate risks that it might suffer or that might be suffered by the applicant and could undermine the independence of the three contracts that underlie the letter of credit payment scheme by forcing the bank to look beyond the face of the presentation documents.

The Court finds that a moderate, more appropriate standard lies within the UCP 500 itself and the opinions issued by the International Chamber of Commerce ("ICC") Banking Commission. One of the Banking Commission opinions defined the term "consistency" between the letter of credit and the documents presented to the issuing bank as used in Article 13(a) of the UCP to mean that "the whole of the documents must obviously relate to the same transaction, that is to say, that each should bear a relation (link) with the others on its face ..." INT'L CHAMBER OF COMMERCE, BANKING COMM'N, PUBLICATION NO. 371, DECISIONS (1975–1979) OF THE ICC BANKING COMMISSION R. 12 (1980). The Banking Commission rejected the notion that "all of the documents should be *exactly* consistent in their wording." *Id.* (emphasis in original).

■ A common sense, case-by-case approach would permit minor deviations of a typographical nature because such a letter-for-letter correspondence between the letter of credit and the presentation documents is virtually impossible. *See* INT'L CHAMBER OF COMMERCE, COMM'N ON BANKING TECHNIQUE AND PRACTICE, PUBLICATION NO. 511, UCP 500 & 400 COMPARED 39 (Charles del Busto ed.1994)(noting the difficulty in attaining mirror-image compliance). While the end result of such an analysis may bear a strong resemblance to the relaxed strict compliance standard, the actual calculus used by the issuing bank is not the risk it or the applicant faces but rather, whether the documents bear a rational link to one another. In this way, the issuing bank is required to examine a particular document in light of all documents presented and use common sense but is not required to evaluate risks or go beyond the face of the documents. The Court finds that in this case the Bank of China's listed discrepancies should be analyzed under this standard by determining whether the whole of the documents obviously relate to the transaction on their face.

■ First, the Bank of China claimed that the beneficiary's name in the presentation documents, Voest–Alpine *Trading*

*USA,* differed from the letter of credit, which listed the beneficiary as Voest–Alpine *USA Trading.* While it is true that the letter of credit inverted Voest–Alpine's geographic locator, all the documents Voest–Alpine presented that obviously related to this transaction placed the geographic locator behind "Trading", not in front of it. Furthermore, the addresses corresponded to that listed in the letter of credit and Texas Commerce Bank's cover letter to the Bank of China identified Voest–Alpine Trading USA as the beneficiary in the transaction with JFTC. The letter of credit with the inverted name bore obvious links to the documents presented by Voest–Alpine Trading USA. This is in contrast to a misspelling or outright omission. *See Beyene v. Irving Trust Co.,* 762 F.2d 4 (2d Cir.1985)(listing beneficiary as "Soran" rather than "Sofan" was sufficient basis for refusal); *Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Co.,* 612 F.Supp. 1533 (S.D.N.Y.1985)(omitting "Ltd." from corporate name justified rejection). In contrast with these cases, the inversion of the geographic locator here does not signify a different corporate entity. The expert testimony of Professor Byrne supports the finding that this is not a discrepancy that warrants rejection of the presentation documents because the UCP 500 does not impose a standard of exact replication.

■ Second, the Bank of China pointed out that the set of originals of the bill of lading should have all been stamped "original" rather than "original," "duplicate" and "triplicate." It should be noted that neither the letter of credit nor any provision in the UCP 500 requires such stamping. In fact, the ICC Banking Commission expressly ruled that "duplicate" and "triplicate" bills of lading did not need to be marked "original" and that failure to label them as originals did not justify refusal of the documents. INT'L CHAMBER OF COMMERCE, BANKING COMM'N, PUBLICATION NO.

565, OPINIONS OF THE ICC BANKING COMM'N 1995–1996 38 (Gary Collyer ed.1997). While it is true that this clarification by the ICC came after the transaction at issue in this case, it is clear from the face of the documents that these documents are three originals rather than one original and two copies. The documents have signatures in blue ink vary slightly, bear original stamps oriented differently on each page and clearly state on their face that the preparer made three original bills. Further, one possible definition of duplicate is "[t]o make or execute again" and one definition of triplicate is "[o]ne of a set of three identical things." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 410, 1237 (1994). While the "duplicate" and "triplicate" stamps may have been confusing, stamps do not make obviously original documents into copies.

■ Third, the Bank of China claimed that the failure to stamp the packing list documents as "original" was a discrepancy. Again, these documents are clearly originals on their face as they have three slightly differing signatures in blue ink. There was no requirement in the letter of credit or the UCP 500 that original documents be marked as such. The ICC's policy statement on the issue provides that, "banks treat as original any document that appears to be hand signed by the issuer of the document." (Int'l Chamber of Commerce, Comm'n on Banking Technique and Practice, *The determination of an "Original" document in the context of UCP 500 sub-Article 20(b)* July 12, 1999). <http://www.iccwbo.org/home/statements rules/statements /1999/the_ determination_of_an_original_document.asp>. The failure to mark obvious originals is not a discrepancy.

■ Fourth, the Bank of China argues that the date of the survey report is after the bill of lading and is therefore discrepant. A careful examination of the survey

report reveals that the survey took place "immediately before/after loading" and that the sample of cargo "to be loaded" was taken. The plain language of the report reveals that the report may have been issued after the bill of lading but the survey itself was conducted before the ship departed. The date does not pose a discrepancy.

■ Fifth, the Bank of China claims that the letter of credit number listed in the beneficiary's certified copy of fax is wrong. The letter of credit number was listed as "LC95231033/95" on the copy of fax instead of "LC9521033/95" as in the letter of credit itself, adding an extra "3" after "LC952." However, adding the letter of credit number to this document was gratuitous and in the numerous other places in the documents that the letter of credit was referenced by number, it was incorrect only in one place. Moreover, the seven other pieces of information contained in the document were correct. The document checker could have easily looked to any other document to verify the letter of credit number, or looked to the balance of the information within the document and found that the document as a whole bears an obvious relationship to the transaction. Madame Gao, the document checker who reviewed Voest–Alpine's presentation documents for the Bank of China, testified that she did not look beyond the face of this particular document in assessing the discrepancy. The cover letter from Texas Commerce Bank, for example, had the correct number.

■ Finally, the Bank of China claims that the wrong destination is listed in the certificate of origin and the beneficiary's certificate. The certificate of origin spelled Zhangjiagang as "Zhangjiagng" missing an "a" as it is misspelled once in the letter of credit, making it consistent. The beneficiary's certificate, however, spelled it "Zhanjiagng," missing a "g" in addition to the "a", a third spelling that did not appear in the letter of credit. Madame Gao first considered the discrepancy a "misspelling" rather than an indication of the wrong port, according to her notes. There is no port in China called "Zhangjiagng" or "Zhanjiagng." "Gng" is a combination of letters not found in Romanized Chinese, whereas "gang" means "port" in Chinese. The other information contained in the document was correct, such as the letter of credit number and the contract number, and even contained the distinctive phrase "by courie lukdt within 3 days after shipment", presumably meaning by courier within three days after shipment, as in the letter of credit. The document as a whole bears an obvious relationship with the transaction. The misspelling of the destination is not a basis for dishonor of the letter of credit where the rest of the document has demonstrated linkage to the transaction on its face.

Based on the foregoing, the Court finds in favor of the plaintiff, Voest–Alpine.

The Clerk shall enter this Order and provide a copy to all parties.