17-1956 (L)
*United States v. Calderon, et al.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2018

(Argued: February 5, 2019          Decided: December 3, 2019)

Nos. 17-1956, 17-1969, 17-2844, 17-2866

————————————————————

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

PABLO CALDERON, BRETT C. LILLEMOE,

*Defendants-Appellants.[1]*

————————————————————

Before:      KEARSE, POOLER, and LIVINGSTON, *Circuit Judges*.

Defendants-Appellants Pablo Calderon and Brett C. Lillemoe appeal from judgments entered in the United States District Court for the District of Connecticut (Hall, *J.*), convicting them of conspiracy to commit bank and wire fraud, and wire fraud in violation of 18 U.S.C. §§ 1349, 1343. On appeal, the Defendants argue that (1) there was insufficient evidence supporting their jury convictions under both statutes; (2) the district court erred in giving a "no ultimate

---

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above.

harm" instruction to the jury; (3) the district court plainly erred in failing to charge the jury that actual, potential, or intended harm is an element of bank fraud, 18 U.S.C. § 1344(2); and (4) the district court abused its discretion in giving a modified *Allen* charge to the deadlocked jury. The Defendants also appeal from postjudgment orders of the district courts setting restitution amounts, contending that the court abused its discretion in directing the Defendants to pay over $18 million in restitution pursuant to the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A. We conclude that (1) there was sufficient evidence supporting the jury convictions; (2) the district court did not err in giving the jury a "no ultimate harm" instruction; (3) the district court did not plainly err in charging the jury on the elements of bank fraud; (4) the district court did not abuse its discretion in giving a modified *Allen* charge to the jury; but (5) the district court abused its discretion in ordering a restitution amount of over $18 million to be paid to the United States Department of Agriculture because the Defendants did not proximately cause financial losses equating to that amount.

Accordingly, the restitution orders are REVERSED; the judgments of conviction are VACATED to the extent that they ordered the Defendants to pay restitution, and are otherwise AFFIRMED. We REMAND for entry of amended judgments omitting the requirement for restitution.

| | |
|---|---|
| FOR APPELLEE: | MICHAEL S. MCGARRY (John Pierpont, Sandra S. Glover, *on the brief*), Assistant United States Attorneys, *for* John H. Durham, United States Attorney for the District of Connecticut, New Haven, CT. |
| FOR DEFENDANT-APPELLANT BRETT C. LILLEMOE: | DAVID C. FREDERICK (Brendan J. Crimmins, Andrew E. Goldsmith, Benjamin S. Softness, *on the brief*), Kellogg, Hansen, Todd, Figel & Frederick PLLC, Washington, D.C. |

2

FOR DEFENDANT-APPELLANT
PABLO CALDERON:          DOUGLAS M. TWEEN, Linklaters LLP, New York, NY, submitted an opening brief; PABLO CALDERON, Darien, CT, submitted a reply brief *pro se* and argued orally.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Defendants-Appellants Brett C. Lillemoe ("Lillemoe") and Pablo Calderon ("Calderon") (together, "Defendants") appeal from their convictions for conspiracy to commit wire and bank fraud, 18 U.S.C. § 1349, and wire fraud, 18 U.S.C. § 1343, following a jury trial in the United States District Court for the District of Connecticut (Hall, *J.*). The Defendants' convictions arose from their involvement in a scheme to defraud two financial institutions—Deutsche Bank and CoBank—in connection with an export guarantee program administered by the United States Department of Agriculture ("USDA"). The Defendants falsified shipping documents and presented these documents to the banks, thereby facilitating the release of millions of dollars in USDA-guaranteed loans to foreign banks.

The Defendants argue that the Government failed to produce sufficient evidence at trial to support their convictions. Specifically, they argue that the Government failed to demonstrate that, in altering these shipping documents, the

3

Defendants made material misrepresentations that deprived the banks of economically valuable information, as required to support a conviction for wire or bank fraud, or conspiracy to commit those offenses. They also argue that the district court erred in giving the jury a "no ultimate harm" instruction, *see infra* Part II.A, plainly erred in charging the jury on the elements of bank fraud, 18 U.S.C. § 1344(2), and abused its discretion in giving the jury a modified *Allen* charge, *see infra* Part III. Finally, they assert that the district court abused its discretion in ordering the Defendants to pay over $18 million in restitution pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A.

We conclude that there was sufficient evidence presented at trial to support the jury's conclusion that the Defendants violated the wire fraud and conspiracy statutes. We also hold that the district court did not err in giving the jury a "no ultimate harm" instruction, did not plainly err in charging the jury on the elements of bank fraud, and did not abuse its discretion in giving a modified *Allen* charge to the jury. Finally, however, we conclude that the district court abused its discretion in holding that the USDA was entitled to a restitution amount of $18,501,353 under the MVRA because the Defendants did not proximately cause financial losses equating to that amount. Accordingly, for the reasons given

4

herein, we reverse the orders of restitution, vacate so much of the judgments as order restitution, and remand for the entry of amended judgments without such orders.

## BACKGROUND

### I.   Factual Background[2]

International business transactions involving the sale of physical goods are presently carried out by use of unique documents and contracts that serve to mitigate risk among the geographically disparate parties.   Such transactions remain highly dependent upon the compilation and presentation of certain physical documents at different stages in the sales process.   Indeed, so crucial are the documents underlying these sales that "international financial transactions" have long been said to "rest upon the accuracy of documents rather than on the condition of the goods they represent."  *Banco Espanol de Credito v. State St. Bank & Tr. Co.*, 385 F.2d 230, 234 (1st Cir. 1967).   The Defendants falsified bills of lading, one such category of shipping documents, so as to render them compliant with contractual and regulatory requirements before their presentation to two U.S.-

---

[2]  The factual background presented here is derived from the parties' submissions and the uncontroverted evidence presented at trial.

based financial institutions.

## A. Letters of Credit in International Sales

Understanding the Defendants' scheme requires a basic comprehension of the use of letters of credit in international sales, in this case sales of agricultural goods. "Originally devised to function in international trade, a letter of credit reduce[s] the risk of nonpayment in cases where credit [is] extended to strangers in distant places." *Mago Int'l v. LHB AG*, 833 F.3d 270, 272 (2d Cir. 2016) (internal quotation marks and citation omitted). As relevant here, the process begins with the contract for the sale of goods negotiated between a domestic exporter and a foreign importer. A typical contract at issue in this prosecution would be one for the sale of soybeans between an American exporter and a Russian importer.

To avoid the risk of nonpayment by the foreign importer, the American exporter bargains for and includes in the contract a term that requires payment by a confirmed and irrevocable letter of credit. The foreign importer then applies to an "issuing bank" (usually a foreign bank) to receive that letter of credit. The foreign-based bank then "issues" the letter of credit in favor of the American exporter, also referred to as the "beneficiary." The letter of credit itself constitutes an "irrevocable promise to pay the []beneficiary when the latter

presents certain documents . . . that conform with the terms of the credit." *Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 815 (2d Cir. 1992). At the same time, the domestic exporter often works with a domestic bank (also referred to as the "confirming" bank) and *assigns* its right to payment on the letter of credit to that domestic bank in exchange for *immediate* payment of the contract price. The payment on the part of the confirming bank to the beneficiary triggers the issuing bank's obligation to reimburse the confirming bank. Thus, the domestic exporter receives immediate payment for the sale from the domestic bank, and the domestic bank is repaid over time and with interest by the foreign bank. The letter of credit thereby mitigates risk by assigning the rights and obligations of the original contract to financial institutions rather than individual importers and exporters. *Alaska Textile*, 982 F.2d at 815.

To obtain immediate payment of the contract price upon assigning its right to payment to a domestic bank, an exporter must compile a complete set of documents and present them to that confirming bank. Among the documents necessary to cause a bank to release funds in conformity with a letter of credit is the final contract of relevance here, the "bill of lading." The bill of lading is a contract between either the exporter or the importer and an international carrier

7

of goods, obligating the carrier to transport the goods to the importer's location or some other distant place. A bill of lading "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 18–19 (2004).[3] The Defendants' presentation of documents, including bills of lading, to confirming banks for inspection in order to induce the banks to honor their obligations under various letters of credit provided the basis for the prosecutions here.

When a confirming bank examines documents submitted to it for the purpose of obtaining payment on a letter of credit, the confirming bank has two duties: (1) to determine whether these documents conform to the terms of the letter of credit; and (2) to respond if it finds any discrepancies. J.A. 893. The confirming bank never sees the goods at issue, only the documents (including the

---

[3] According to the Defendants' expert, negotiable bills of lading allow for the flexibility of selling goods while they are in transit; non-negotiable bills do not. Regardless of whether a bill of lading is negotiable or non-negotiable, only an original bill of lading serves as a document of title; a copy of a bill of lading functions primarily as a receipt. Conversely, the Government's expert explained at trial that bills of lading are issued in sets that typically consist of three originals and any number of copies, which are referred to as "copies non-negotiable." In any event, the experts agree that a "copy non-negotiable" bill meaningfully differs from either a "negotiable" or "original" bill, and we need not decide which expert is correct in order to resolve the Defendants' sufficiency of the evidence challenge.

bill of lading). J.A. 391. Because of this, it inspects the documents *rigorously* to determine that they comply *exactly* with the requirements of the letter of credit—for the documents are its only protection. *Id.*

Indeed, under the law of the majority of jurisdictions (including this one) if the documents provided by the seller to the confirming bank *did not* "strictly" comply with the requirements of the letter of credit, the issuing bank is entitled to refuse to honor the letter of credit, and the confirming bank is therefore unable to recover the money "assigned" to it by the seller. *See Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 683–85 (2d Cir. 1983); *see also Mago Int'l*, 833 F.3d at 272 (noting that the "absolute duty" to honor the letter of credit "does not arise unless the terms of the letter have been complied with strictly" (internal quotation marks and citation omitted)). "This rule [of strict compliance] finds justification in the bank's role in the transaction being ministerial, and to require it to determine the substantiality of discrepancies would be inconsistent with its function." *Alaska Textile*, 982 F.2d at 816. If the documents were nonconforming but honored, an issuing bank could sue a confirming bank for "wrongful honor." *See, e.g., Bank of Cochin, Ltd. v. Mfrs. Hanover Tr. Co.*, 808 F.2d 209 (2d Cir. 1986) (dismissing on the ground of estoppel only because the issuing bank did not

9

comply with the requirements of the International Chamber of Commerce's Uniform Customs and Practice for Documentary Credits ("UCP"), Article 8, calling for timely notice of discrepancies in the documents).

As the Defendants themselves note, in a letter of credit transaction "'[b]anks deal with documents and not with goods, services or performances to which the documents may relate.'" Br. Def.-Appellant Lillemoe at 5 (quoting Int'l Chamber of Commerce, *ICC Uniform Customs and Practice for Documentary Credits* art. 5 (2007)); *see also* S.A. 98. In sum, "because the credit engagement is concerned only with documents, . . . [t]here is no room for documents which are almost the same, or which will do just as well." *Alaska Textile*, 982 F.2d at 816 (internal quotation marks and citation omitted).

**B. The GSM-102 Program and the Defendants' "Structured" Transactions**

The GSM-102 program—which is administered by USDA's Foreign Agricultural Service on behalf of the Commodity Credit Corporation ("CCC"), the USDA entity that issues the credit guarantees—provides an incentive for United States banks to participate in letters of credit export transactions with developing nations. As already made clear, the seller in such a transaction enjoys immediate payment for the sale, but the domestic bank must accept the risk that a foreign bank will default on its payment obligations, and in circumstances in which

redress may be difficult, if not impossible, to obtain. To encourage U.S.-based banks nevertheless to participate in such transactions, the CCC, through the GSM-102 program, *guarantees* the foreign bank's repayment to the domestic bank, generally covering ninety-eight percent of the foreign bank's obligation under the letter of credit. Every fiscal year, the USDA makes $5.5 billion available under the GSM-102 program.

The Defendants were not the exporters of agricultural goods, but instead participated in the GSM-102 program as financial intermediaries, creating "structured" or "third party" transactions. Essentially, the Defendants would pay a fee to "rent" or "purchase" program-eligible "trade flows," *i.e.*, the actual shipments of goods guaranteed by the GSM-102 program, from physical exporters and importers. Having secured the requisite "trade flow," the Defendants would arrange for letters of credit between foreign and domestic banks backed by the USDA guarantee. In exchange, they received fees from the foreign banks. In orchestrating these GSM-102 transactions, the Defendants were also responsible for the presentation of complying documents to the confirming (in this case the domestic) banks. *See* J.A. 1020 (Testimony of Lillemoe stating "[It's] not exactly a simple process . . . So my role is to put together a lot of different pieces and make

11

the transaction work . . . we describe it as sort of lining up the sun, the moon and the stars to align everything and put it all together").

### C. Altering Bills of Lading and the "Cool Express" Transaction

Participating in the GSM-102 program as a financial intermediary is not itself illegal. The Defendants were convicted of wire fraud and conspiracy to commit wire and bank fraud for falsifying bills of lading before presenting them to two banks, Deutsche Bank and CoBank, in order to make the documents facially compliant with the terms of the relevant letters of credit and the requirements of the GSM-102 program. According to the evidence presented by the Government at trial, the Defendants applied for the GSM-102 program guarantees before acquiring the requisite "trade flow." They would then purchase shipping documents and arrange for letters of credit between foreign and domestic banks backed by this USDA guarantee. If the purchased documents failed to comply with the USDA's requirements as well as those provided for in the relevant letters of credit, the Defendants would simply falsify the documents to *make* them compliant. Of central importance are two types of alterations, which were explored at length in the trial described below: (1) the Defendants' redaction of the phrase "copy non-negotiable" and the stamping of the word "original" onto bills of lading; and (2) the Defendants' changing of certain bills of ladings' "on-board"

dates.

Finally, all of the counts of wire fraud on which the Defendants were convicted involved conduct relating to a GSM-102 transaction between CoBank and the International Industrial Bank located in Russia ("IIB"). The letter of credit for that transaction was issued by IIB, and the goods were shipped on a vessel called the "Cool Express." J.A. 1074, 1077. To facilitate this "Cool Express" transaction, Lillemoe "whited out" the word "copy non-negotiable" on some of the bills of lading and placed an "original" stamp on them. J.A. 1092–94. These modified documents were forwarded to Calderon for his review before their submission to CoBank. J.A. 1093–94. Following the global financial crisis in 2007, IIB defaulted on its $6,000,000 in obligations to CoBank under the letter of credit. The USDA reimbursed the full amount available under the guarantee (ninety-eight percent of the loan value).[4]

## II. Procedural History

On February 20, 2015, a grand jury returned a twenty-three-count indictment against Lillemoe, Calderon, and their associate, Sarah Zirbes. The Indictment charged Lillemoe with one count of conspiracy to commit bank fraud

---

[4] The Defendants paid CoBank an upfront fee of three percent.

13

and wire fraud, nineteen counts of wire fraud, one count of bank fraud, and one count of money laundering. It charged Calderon with one count of conspiracy to commit wire fraud and bank fraud, nineteen counts of wire fraud, one count of bank fraud, one count of money laundering, and one count of making a false statement. The Indictment alleged, in part, that Lillemoe and Calderon conspired to commit bank fraud and wire fraud by materially altering shipping documents.

## A. The Trial

At trial, the Government offered a variety of evidence to demonstrate that the Defendants applied for guarantees under the GSM-102 program, purchased "trade flows" from third-parties that would *not* have been compliant with the terms of the program, arranged letters of credit between foreign and domestic banks, falsified bills of lading, and then presented those altered documents to Deutsche Bank and CoBank, causing the banks to disburse funds to a U.S. exporter according to the terms of letters of credit associated with ten GSM-102 transactions. The Government introduced, *inter alia*, (a) the GSM–102 program files that contained the documents that were submitted to the American banks along with (b) the unaltered bills of lading that were provided to Lillemoe and

14

Calderon and the subsequently altered versions. The Government also introduced the testimony of CoBank representative Holly Womack, Deutsche Bank representative Rudolph Effing, USDA official John Doster, and Federal Bureau of Investigation Special Agent Steven West. The Government and the Defense introduced competing experts on letters of credit transactions, and Lillemoe testified in his own defense.[5] Because the significance of the Defendants' alterations of the bills of lading is the central issue on this appeal, we catalogue the evidence offered on this question below.

### 1. Stamping

The Government submitted evidence that the Defendants falsified bills of lading by redacting the word "copy non-negotiable" or "certified true copy" (usually via white out) and stamping the word "original" onto a number of them. The Defendants do not dispute that they modified the bills of lading in question nor that the respective letters of credit governing these altered bills of lading required presentation of a "copy of original on board . . . bill(s) of lading." J.A. 1851. Moreover, the Government presented evidence at trial that in order to submit a claim of loss to the GSM-102 program, a bank would need to submit a

---

[5] The Defendants also introduced various character witnesses.

15

*copy of an original* bill of lading. J.A. 1791. The Government also submitted evidence as to the Defendants' knowledge of this requirement. *See, e.g.* J.A. 3617–18 (Email from Lillemoe stating "just checked with the bank financing the GSM deal. They need the copy of the [bill of lading] to state 'Original' in order to accept it"). CoBank representative Womack and Deutsche Bank representative Effing testified respectively at the Defendants' trial that they would not have accepted the Defendants' bills of lading (and therefore would not have released funds on the transactions) had they known that the Defendants had stamped the word "original" onto "copy non-negotiable" bills of lading. That is, if their banks "didn't have a copy of an original" they "wouldn't have paid the funds." J.A. 458. At trial, however, the Defense attempted to characterize the modifications to the bills of lading as insignificant, trivial changes that could not have affected the confirming banks' decisions as to whether to honor the letters of credit. Lillemoe testified that he stamped the word "original" in blue ink on the bills of lading in order to make it "easier for everybody." J.A. 1010. The Government and Defense also offered competing expert testimony as to the significance of the stamping activity.

### 2. Date Changes

The GSM-102 program guarantees also had restrictions limiting them to

16

shipments that occurred within specific date ranges. The Government introduced substantial evidence at trial demonstrating that Lillemoe and Calderon changed the "on-board" notation printed on three bills of lading associated with two GSM-102 transactions to state October 6, 2008, instead of October 5, 2008. J.A. 1057. The Defendants' alterations placed the shipments within an acceptable range. *See* 7 C.F.R. §§ 1493.20(d), 1493.60(f) (2012) (GSM-102 regulations stating that "date[s] of export prior to the date" of the guarantee application "are ineligible for . . . guarantee coverage" and defining a "date of export" as a bill of lading's "on board date"). Thus, the Government argued at trial that the Defendants altered dates on bills of lading to ensure each underlying transaction's eligibility for a GSM-102 guarantee. The parties contest neither that the relevant goods were aboard the ships on October 6th, nor that they were actually *shipped* on October 5th.

According to the Defense experts and Lillemoe, the "on-board" date on a bill of lading has a functional significance and can fall on *any date* that the goods are "on board" the ship. The Government presented a great deal of evidence, however, in support of its claim that the "on-board" date can *only* represent the date the goods are *actually* shipped, and that this understanding was shared by all

17

parties involved.   For example, the Government's expert, Professor James Byrne, testified at trial:

> A. [The on-board date] is deemed to indicate the date that the goods are shipped.   The date of shipment is extremely important in letter of credit practice.   It is important to banks.   It is important to applicants in most cases. And so the date which is given as the on board or loaded on board date is deemed to be the date of shipment or shipping. Shipping date. . . .
>
> Q. Can that be a range of dates?
>
> A. No.   It is the date they are loaded on board.

J.A. 1246.   USDA Official Doster, who was responsible for ensuring that "registrations were properly issued for the GSM-102 program," J.A. 522, also testified to that effect, as well as to that date's importance with regard to the USDA guarantee.   J.A. 455, 526 ("Q: [D]oes the program ever guarantee [with respect to] shipments before the on board date? A: No"); *see also* J.A. 396 (defining "registration" as a record reflecting "that the CCC has shipped that guarantee and received the fee and then they recorded that guarantee in their books as . . . a guarantor obligation on behalf of the CCC").[6]

---

[6] The Government also presented evidence at trial that the Defendants shaded blank "consignee" fields (which designate the receiving party of the goods) on six bills of lading, allegedly to make it less "obvious" that the consignee fields had been whited-out. J.A. 1018.   The Defense offered evidence that the fields were whited-out to protect the confidentiality of the consignee. *See* J.A. 887–88.   The Defendants were acquitted of all

18

## B. The Jury Verdict and Post-Trial Motions

On November 3, 2016, after hearing eighteen days of evidence, the jury began its deliberations. The jury deliberated for about a week, before stating that it had "concluded" deliberations, but informing the court that it was "deadlocked" on some counts. J.A. 1352. The court decided to give a modified *Allen* charge, which encouraged the jury to continue deliberating (discussed, *infra* Part III). After receiving the *Allen* charge, the jury returned a verdict of guilty for Lillemoe on Count One of conspiracy and Counts Two through Six of wire fraud, and it returned a verdict of guilty for Calderon on Count One of conspiracy and Count Six of wire fraud.[7] The Defendants were acquitted on the other counts of wire fraud, bank fraud, money laundering, and false statements. Following the guilty verdict, the district court sentenced Lillemoe to fifteen months' imprisonment to be followed by three years of supervised release, and it sentenced Calderon to five months' imprisonment. The Court also ordered forfeiture in the amount of $1,543,287.60 from Lillemoe and $63,509.97 from Calderon.

Lillemoe and Calderon each filed a motion for a judgment of acquittal

---

of the substantive counts of wire fraud that were connected to this "shading" activity.

[7] The jury acquitted Zirbes on all counts.

pursuant to Rule 29 of the Federal Rules of Criminal Procedure and a motion for a new trial pursuant to Rule 33. In an order dated March 16, 2017, the district court denied both motions. *United States v. Lillemoe*, 242 F. Supp. 3d 109, 115 (D. Conn. 2017). On September 11, 2017, the district court entered separate restitution orders as to both Defendants. *United States v. Lillemoe*, No. 15-CR-25 (JCH), 2017 WL 3977921, at *1 (D. Conn. Sept. 11, 2017). The district court held that the USDA was entitled to an order of restitution of $18,501,353 after reimbursing the banks in the GSM-102 program for various transactions with which the Defendants were involved. *Id.* The district court also ordered the Defendants to pay CoBank $305,743.33. *Id.* at *2. Each defendant filed timely notices of appeal from the judgment and the restitution order entered against him.

## DISCUSSION

The Defendants raise a variety of challenges to their respective convictions and the ensuing restitution orders imposed by the district court. Many of these challenges relate to the Defendants' central contention that their alterations of the bills of lading were not and could not have been fraudulent. Ultimately, we reject that central contention. We do conclude, however, that the district court abused its discretion in fashioning the restitution orders at issue here.

20

**I.**

The Defendants first challenge the sufficiency of the evidence underlying their convictions for wire fraud and conspiracy to commit wire and bank fraud. The Defendants concede that they modified bills of lading in connection with various international transactions guaranteed by the GSM-102 program, but they argue that the Government failed to produce sufficient evidence at trial to support the jury's determination that this conduct satisfied the elements of wire or bank fraud (or conspiracy to commit the same). We disagree and find no reason to upset the jury's determination on this question.

We note at the outset that a defendant who challenges the sufficiency of the evidence to support his conviction "faces an uphill battle, and bears a very heavy burden." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (internal quotation marks and citation omitted). In considering such a challenge, "[w]e must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility." *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018) (internal quotation marks and brackets omitted). "Although sufficiency review is *de novo*, we will uphold the judgment of

conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks and brackets omitted).

The essential elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *Fountain v. United States,* 357 F.3d 250, 255 (2d Cir. 2004) (internal quotation marks and brackets omitted). Similarly, the federal bank fraud statute criminalizes the "'knowing execution' of a scheme to 'defraud a financial institution.'" *United States v. Bouchard*, 828 F.3d 116, 124 (2d Cir. 2016) (quoting 18 U.S.C. § 1344) (brackets omitted). Thus, both wire fraud and bank fraud require the Government to prove that the defendant had an intent to deprive the victim of money or property. Moreover, to establish the existence of a scheme to defraud, the Government must prove the *materiality* of a defendant's false statements or misrepresentations. *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017). The Defendants argue that (1) the Government failed to offer sufficient evidence as to the "materiality" of their alterations to the bills of lading; and (2) that the Government failed to present sufficient evidence that they intended to

22

deprive the victim banks of money or property. We take each of these arguments—and reject them—in turn.

**A.**

We first consider the Defendants' materiality claim. The wire and bank fraud statutes do not criminalize every deceitful act, however trivial. As noted above, to sustain a conviction under these statutes, the Government must prove that the defendant in question engaged in a deceptive course of conduct by making *material* misrepresentations. *Neder v. United States*, 527 U.S. 1, 4 (1999). "To be 'material' means to have probative weight, i.e., reasonably likely to influence the [bank] in making a determination required to be made." *United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007). As the Supreme Court has put it, a material misrepresentation has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it [is] addressed." *Neder*, 527 U.S. at 16 (internal quotation marks and citation omitted). Where, as here, a "bank's discretion is limited by an agreement, we must look to the agreement to determine what factors are relevant, and when a misstatement becomes material." *Rigas*, 490 F.3d at 235. All of these

23

specifications of the materiality inquiry target the same question: would the misrepresentation actually *matter* in a *meaningful way* to a rational decisionmaker?

The Defendants argue that their alterations to the bills of lading could not have been material to the banks. They point to *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), where we held that a defendant's admitted misstatements were not material to the Treasury Department because the Government had submitted *no* evidence demonstrating that these misstatements were capable of influencing a Treasury Department decision. *Id.* at 172. Instead, the evidence presented at trial established that the Treasury was "kept . . . away from making buy and sell decisions" and retained "no authority to tell investment managers which [security] to purchase or at what price to transact." *Id.* (internal quotation marks, brackets, and citation omitted). Similarly, in *Rigas*, we held that because there was no evidence that the Defendants' misstatements there would have influenced the banks' investment decisions as to what interest rate to charge, those misstatements were not material. 490 F.3d at 235.

The Defendants argue that the banks here, like the Treasury Department in *Litvak* and the banks in *Rigas*, retained limited discretion in rejecting the documents, and that the Government offered insufficient evidence that the

24

changes made to the bills of lading were capable of influencing the banks' decisions. Specifically, the Defendants first argue that the domestic banks' decisions as to whether to release the funds for these transactions were *not* discretionary *at all*, but were instead governed by the terms of the letters of credit, and contingent only on the banks' being presented with evidence that the shipment was program compliant. Thus, because the bills of lading *appeared* to be compliant with the letters of credit and the GSM-102 program requirements, the argument goes, the banks had no discretion to reject them and any alterations were immaterial.

We reject this argument. As the court below described it, the Defendants essentially assert that "if the bank is presented with a document altered carefully enough," the bank lacks discretion to decline to honor the letter of credit and the misrepresentations therefore lack materiality. *Lillemoe*, 242 F. Supp. 3d at 117. In other words, under the Defendants' theory, the better the fraudster, the less likely he is to have committed fraud. We decline to reverse the jury's rejection of this argument, which would entail countenancing any and all falsifications of documents involved in these or similar transactions, as long as they were carried out with sufficient skill.

The Defendants next argue that the bills of lading they provided fulfilled the obligations of the letters of credit prior to their altering them. Therefore, their theory goes, the Defendants *needlessly* modified the documents because, in any event, the bills of lading already fulfilled the function of the "required document[s]" even if they were altered in minor ways. Br. Def.-Appellant Lillemoe at 27. The Government offered substantial evidence at trial, however, that the banks could have and would have rejected the bills of lading had they not been altered or had the banks known of the specific alterations at issue. The relevant letters of credit clearly called for "copies of original" bills of lading, as did the GSM-102 program, *see, e.g.* J.A. 1851–54 (requiring a copy of an "original on board . . . bill(s) of lading"), 1791 (requiring "a true and correct copy" of "the negotiable . . . bill(s) of lading"), and the program guarantees had restrictions limiting them to shipments that occurred within specific date ranges. J.A. 526.

Given these requirements, it is not surprising that CoBank representative Holly Womack and Deutsche Bank representative Rudolph Effing testified that their respective banks would have declined to go through with the transactions at issue had they known about the specific alterations the Defendants made to the bills of lading. *See, e.g.* J.A. 458 (testimony of Womack that if the confirming bank

26

"didn't have a copy of an original on board, original bill of lading" it "wouldn't have paid the funds" because "we [wouldn't] have a complying set of documents so we wouldn't have an obligation under the [letter of credit] [from the] issuing bank"); J.A. 470 (testimony of Womack that she would not have accepted the unaltered bill of lading prior to the Defendants' date change because it would have made the document non-compliant and "[w]e wouldn't be able to file a claim [with the USDA] and be paid if the bank defaulted on the obligation"); J.A. 421 (testimony of Effing that "if any of the information that's on that document is not in compliance with the requirements on the program or letter of credit, then we just can't accept it"). After all, to submit a claim to the USDA, the banks had to submit these documents and certify that they were "true and correct copies of the originals that [they] received." J.A. 463. The testimony of USDA Official Doster, moreover, buttressed this testimony as to the materiality of the Defendants' changes, J.A. 548–49, as did the Government's expert, who testified as to the functional significance of the Defendants' changes. J.A. 1248–49. For example, to qualify for the already-secured USDA guarantee, the shipments involved had to have occurred on or after October 6, 2008. The Defendants' alterations implicated compliance with that requirement.

27

Additionally, the Government produced several of the Defendants' *own* communications, which spoke to the materiality of the Defendants' changes. *See* J.A. 3616 (e-mail from Lillemoe stating that "we'll need a copy [of] the ORIGINAL [bill of lading]. We cannot execute with the 'Non-Negotiable' version"); J.A. 3617–18 (e-mail from Lillemoe stating "just checked with the bank financing the GSM deal. They need the copy of the [bill of lading] to state 'Original' in order to accept it."); J.A. 1907 (e-mail from Lillemoe stating "[f]or us we need [bills of lading] to state 'Original' and that are signed. We'll simply white out the 'Copy Non-Negotiable' on the signed copies and stamp 'Original' ourselves. So we're now OK on the [bills of lading]."); J.A. 2343 (e-mail from Lillemoe to Calderon describing a date change as "[n]ot my best work, but good enough for now"). These statements provide additional evidence that the confirming banks needed to receive copies of "original" bills of lading with specific "on-board" dates in order to honor their obligations under the letters of credit. They therefore provide further support for the conclusion that the banks could have and would have rejected nonconforming documents such as those at issue here, and that the discrepancies were material to the GSM-102 guarantees.

In sum, the Government produced a variety of testimonial and

28

documentary evidence demonstrating that the Defendants falsified documents in order to make them appear to be compliant with the terms of the governing letters of credit and the USDA program. The jury was also presented with substantial evidence that had the bank officials known about those specific types of alterations they would *not* have accepted those documents and therefore would not have entered into the transactions at issue. We conclude, in light of the evidence described above and marshalled at trial, that the Government presented sufficient evidence for the jury to conclude that the Defendants' misstatements were material.

**B.**

The Defendants next argue that the Government failed to produce sufficient evidence to support the jury's conclusion that their scheme "contemplated some actual harm or injury to their victims," *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (emphasis, quotation marks, and citation omitted), a necessary element of their offenses of conviction. As we have often observed, for the purposes of satisfying the elements of mail, wire, or bank fraud, a victim can be deprived of "property" in the form of "intangible" interests such as the right to control the use of one's assets. *United States v. Carlo*, 507 F.3d 799, 801–02 (2d Cir.

2007). "[M]isrepresentations or non-disclosure of information" can support a conviction under the "right to control" theory if "those misrepresentations or non-disclosures can or do result in tangible economic harm." *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017). In particular, this Court has upheld convictions where misrepresentations "exposed the lender . . . to unexpected economic risk." *United States v. Binday*, 804 F.3d 558, 571 (2d Cir. 2015).

The Government produced a variety of evidence to support the jury's finding that the Defendants' falsifications exposed the confirming banks to severe economic risks across two dimensions. First, the Government produced evidence that the modifications to the bills of lading exposed the banks to risk of default or non-reimbursement from the *foreign* banks because these modifications sought to hide the true nature of the non-conforming documents. *See, e.g.*, J.A. 459 (CoBank representative Womack testifying that "we need to have [compliant] documents to have the issuing [letter of credit] . . . repay us"); J.A. 1249 (Government expert Professor Byrne stating that only the issuing bank can propose a change to the terms of a letter of credit). As recounted above, a confirming bank must determine if the presentation is compliant with the terms of a letter of credit, and it can reject non-compliant documents. This Circuit has

emphasized in the civil context that documents' compliance with the terms of a relevant letter of credit should generally be analyzed under a standard of "strict compliance," a standard followed by a majority of courts. *See Mago Int'l*, 833 F.3d at 272. And the economic significance of the precise accuracy of the documents (including the bills of lading) was testified to at trial. *See, e.g.*, J.A. 405 (testimony of Deutsche Bank representative Effing, noting that accuracy is "[s]uper important. Because that's how we determine . . . whether all the [letter of credit's] terms and conditions are fulfilled").

The Defendants highlight that:

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.

*Binday*, 804 F.3d at 570 (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). According to the Defendants, the victim banks got "what [they] bargained for" because they made "valid, 98%-guaranteed, interest-bearing loans to USDA-approved, developing-world foreign banks." Br. Def.-Appellant Lillemoe at 24. But the Defendants ignore that the confirming banks did not receive "what they bargained for" because they bargained for a set of documents

31

that complied with the letters of credit and satisfied the USDA guarantee requirements.

Second, the modifications increased the risk that the USDA would decline to reimburse the banks in the event of a foreign bank's default. The evidence amply established that the Defendants falsified documents that were not in accordance with the governing GSM-102 regulations to make them guarantee-eligible. For example, the Government produced evidence at trial that, on three bill of lading copies associated with two GSM-102 transactions, the Defendants changed the printed "on-board" date of October 5, 2008, to October 6, 2008. For the transactions at issue to qualify for the already-secured USDA guarantee, the shipments involved had to have occurred on or after October 6, 2008. As noted above, several parties testified to the significance of this change at trial. For instance, USDA official Doster testified as follows:

> A: When the [good] is loaded onto the vessel, a bill of lading is issued. And on that bill of lading is what's called a clean on board date. The clean on board date is the date that's stamped that is considered the date of the export.
>
> Q: Is that an important date?
>
> A: This is an important date. For one, it is important because it can determine ownership . . . The on board date . . . establishe[s] that ownership has passed. Our guarantee specifies the date range . . .

32

through which you may export. So the on board date on the bill of lading is the date you would look at to determine if the exporter is falling within the terms of the guarantee . . . .

Q: And does the program ever guarantee [with respect to] shipments before the on board date?

A: No. No.

J.A. 524; *see also* 7 C.F.R. §§ 1493.20(d), 1493.60(f) (2012) (GSM-102 regulations stating that "date[s] of export prior to the date" of the guarantee application "are ineligible for . . . guarantee coverage" and defining a "date of export" as a bill of lading's "on board date"). Doster's testimony was supported by that of the Government's expert, Professor James Byrne, who stated at trial that an "on board date" is "extremely important in letter of credit practice" and refers only to "the date [the goods] are loaded on board," and that he had "never" heard of the on-board date as being a "range" of dates. J.A. 1246–47. Similar testimony was also offered as to the significance of the Defendants' "stamping" activity on the banks' ability to obtain reimbursement from the USDA. *See, e.g.*, J.A. 459. For example, the Government presented substantial evidence that in order to submit a claim of loss to the GSM-102 program, a bank would need to submit a *copy of an original* bill of lading. J.A. 1791.

The GSM–102 regulations in effect at the time provided that an assignee

33

could not be held liable for an exporter's misrepresentations of which the assignee lacked knowledge. *See* 7 C.F.R. § 1493.120(e) (2012). This provision, however, does not remotely suggest, as the Defendants would have it, that there was insufficient evidence that they contemplated any harm to the banks. As the district court noted, a confirming bank seeking indemnification pursuant to the GSM-102 program can rely on this provision only if "the assignee . . . has no knowledge." *Lillemoe*, 242 F. Supp. 3d at 119. Such a question could certainly have resulted in "protracted and costly litigation" as to whether the confirming bank "had knowledge of the nature of the documents it had accepted." *Id.*; *see also United States v. Frank*, 156 F.3d 332, 335 (2d Cir. 1998) (finding intended harm proven where defendant waste disposers made misrepresentations to their customer that "could have subjected the [customer] to fines and to the loss of its environmental permit"). And the jury did not need to speculate as to the likelihood of such a dispute: USDA official Doster, who again, was responsible for ensuring that registrations were properly issued for the GSM-102 program, specifically testified that the Defendants' changes put the banks at risk of non-reimbursement. *See* J.A. 548; *see also* J.A. 2586.

The Government presented a great deal of evidence that the Defendants'

submission of falsified, non-compliant documents exposed the victim banks to the risk of "actual harm or injury" on *multiple* dimensions. We therefore decline to reverse the jury's determination that the Defendants' scheme contemplated economic harm.

## II.

The Defendants next challenge two jury instructions issued by the district court, only one of which they objected to at trial. "[W]e review a properly preserved claim of error regarding jury instructions *de novo*," but we will reverse "only where, viewing the charge as a whole, there was a prejudicial error.'" *United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) (internal quotation marks and citation omitted). If a defendant fails to object to a jury instruction at trial, however, a plain error standard of review applies on appeal. Fed. R. Crim. P. 30(d), 52(b). With these standards in hand, we consider and reject each of these challenges in turn.

## A.

First, the Defendants challenge the district court's decision to give a "no ultimate harm" charge to the jury. A "no ultimate harm" instruction advises the jury that "where some immediate loss to the victim is contemplated by a

defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct." *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (quoting 2 Leonard B. Sand *et al.*, *Modern Federal Jury Instructions* § 44.01 at 44-35). Such a charge is "proper where (1) there was sufficient factual predicate to necessitate the instruction, (2) the instruction required the jury to find intent to defraud to convict, and (3) there was no evidence that the instruction caused confusion." *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016). The district court declined to include a "no ultimate harm" charge in the preliminary jury instructions, but it changed course after the Defendants' attorneys made several references at trial to the fact that the banks were ultimately insulated against immediate financial loss by the USDA guarantees. *See, e.g.*, J.A. 501 (calling on witness to confirm that banks were "covered 101 percent on this deal").

The district court's "no ultimate harm" instruction satisfies all three of the above-mentioned factors. First and foremost, the Defendants' trial strategy, which focused on the fact that the banks were "ultimately" reimbursed for their losses by the USDA, *see* Br. Def.-Appellant Lillemoe at 42; Br. Def.-Appellant

Calderon at 52, created the "factual predicate" necessitating the charge. *Lange*, 834 F.3d at 79. The district court simply instructed the jurors that they should not acquit on the basis of the Defendants' asserted belief that things would all work out in the end—that the USDA would, in any event, guarantee the transactions—if they nonetheless found that the Defendants intended to deceive the banks as to the economic risks involved *ex ante*. That instruction comports with our holding in *United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011), where we upheld a "no ultimate harm" instruction that "ensured that jurors would not acquit if they found that the defendants knew the [transaction] was a sham but thought it beneficial for the stock price in the long run." *Id.* at 280. In *Ferguson*, we reasoned that "the immediate harm in such a scenario is the denial of an investor's right to control her assets by depriving her of the information necessary to make discretionary economic decisions," and that the absence of ultimate harm to the stock price did not vitiate that more immediate harm to victims. *Id.* (internal quotation marks and citation omitted). We reason similarly here.

The second and third factors are even more easily satisfied. The district court's instruction indisputably required the jury to find intent to defraud to convict. *See, e.g.*, J.A. 1310 ("A genuine belief that the scheme never exposed the

37

victim to loss or risk of loss in the first place would demonstrate a lack of fraudulent intent."). Finally, there was no evidence that the instruction caused confusion. *Cf. Rossomando*, 144 F.3d at 199, 203 (jury request that the court clarify its "no ultimate harm" instruction demonstrated "evident confusion" resulting from instruction). Given the foregoing analysis, we find no error in the district court's "no ultimate harm" instruction under the circumstances of this case.

**B.**

The Defendants also challenge—without having done so below—the district court's jury instructions regarding the elements of bank fraud. Because the Defendants did not object to this portion of the jury charge at trial, we review the district court's instructions for plain error here. *See* Fed. R. Crim. P. 52(b); *accord Johnson v. United States,* 520 U.S. 461, 466–67 (1997). Under the plain error standard:

> [A]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and citation omitted); *see also United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013).

38

Under 18 U.S.C. § 1344, bank fraud is defined as the knowing execution of "a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." The district court instructed the jury on these elements, specifically explaining that the defendant must have "executed or attempted to execute the scheme with the *intent to obtain money or property from Deutsche Bank*." J.A. 1315 (emphasis added). With respect to that intent requirement, the court elaborated that "the Government must prove that the defendant you are considering executed or attempted to execute the scheme knowingly and willfully and with the intent to obtain money or property owned by or under the custody or control of Deutsche Bank." J.A. 1316.

The Defendants argue that the district court should have instructed the jury that a bank fraud conviction requires a finding that the defendant "contemplated harm or injury to the victim." Br. Def.-Appellant Calderon at 58. In advancing this argument, the Defendants rely on Second Circuit precedent stating that "[t]he failure to instruct on an essential element of the offense generally constitutes plain error." *United States v. Javino*, 960 F.2d 1137, 1141 (2d Cir. 1992). In response, the

Government asserts that, even assuming Second Circuit precedent requires the instruction the Defendants' belatedly argue should have been provided, the Supreme Court's decision in *Loughrin v. United States* has adopted a more limited construction of the elements of bank fraud. *See* 573 U.S. 351, 356 (2014) (holding that the Government need not prove that a defendant charged with § 1344(2) intended to defraud a bank); *see also United States v. Bouchard*, 828 F.3d 116, 124 (2d Cir. 2016). The parties dispute whether *Loughrin* affects the Second Circuit's preexisting interpretation of the bank fraud statute, *see United States v. Nkansah*, 699 F.3d 743, 748 (2d Cir. 2012) (holding that "intent to victimize a bank" is an element of bank fraud), and whether the Defendants' proposed instruction was required under either interpretation.

We need not wade into this debate. Even assuming *arguendo* that the district court erred in not including the Defendants' proposed instruction, the failure to include that instruction did not constitute plain error under the standard articulated above. Most obviously, the absence of the proposed instruction did not affect the Defendants' "substantial rights," Fed. R. Crim. P. 52(b), because the jury *acquitted* the Defendants on the substantive bank fraud charge, convicting them only of several substantive wire fraud charges and conspiracy to commit

40

wire fraud *and* bank fraud. Because we have already concluded that there was sufficient evidence to sustain the Defendants' convictions for wire fraud, *see supra* Part I, their convictions for conspiracy could have rested on those grounds alone. The bank fraud instructions therefore did not prejudice the Defendants. *See Ferguson*, 676 F.3d at 277. Moreover, given the district court's detailed instructions on the elements of bank fraud that tracked the language of the bank fraud statute, as well as the ambiguities regarding the elements of bank fraud in the caselaw described above, any error in the jury instructions was certainly not "clear or obvious." *Marcus*, 560 U.S. at 262. Finally, the Defendants have not explained how any alleged error in the jury instructions could have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id*. Accordingly, we reject the Defendants' argument that the district court plainly erred in instructing the jury on the elements of bank fraud.

**III.**

The Defendants next argue that their convictions should be vacated because the district court issued an improper jury charge encouraging the jury to continue deliberating after reaching an apparent deadlock. A defining characteristic of a so-called *Allen* charge is that "it asks jurors to reexamine their own views and the

41

views of others." *Spears v. Greiner*, 459 F.3d 200, 204 n.3 (2d Cir. 2006). This Court reviews a district court's decision to give an *Allen* charge for abuse of discretion. *United States v. Vargas-Cordon*, 733 F.3d 366, 377 (2d Cir. 2013).

During their deliberations, the jurors sent out two notes to the court indicating that they were struggling to reach a unanimous verdict on some of the counts charged in the indictment. After almost a full week, the jury announced via a third note to the court that it had "concluded [its] deliberations." J.A. 1352. After consulting with the jury foreman, the district court determined that the jury was still deadlocked on some counts and decided to give a modified *Allen* charge. The district court instructed the jury, *inter alia*, that:

> It is desirable for you to keep deliberating and to reach a verdict if you can conscientiously do so. However, under no circumstances should any juror abandon his or her conscientious judgment. It is understandable and quite common for jurors to disagree. . . .
>
> [T]here appears to be no reason to believe if the charge were to be submitted to another jury, that jury would be more intelligent, more impartial or more competent to decide it than you are. However, I stress to you, that your verdict must reflect the conscientious judgment of each juror. Under no circumstances should any jur[or] yield his or her conscientious judgment. Do not ever change your mind because the other jurors see things differently or just to get the case over with.

J.A. 1358.

42

"An *Allen* charge is unconstitutional if it is coercive in the context and circumstances under which it is given." *United States v. Haynes*, 729 F.3d 178, 192 (2d Cir. 2013). Considering the "different factors" we have enumerated to determine an *Allen* charge's "coercive effect," *Vargas-Cordon*, 733 F.3d at 377, we are confident that the district court's carefully crafted *Allen* charge did not constitute reversible error. At the start, we recognize a distinction between "the original *Allen* charge," which conveys "the suggestion that jurors in the minority should reconsider their position," and the modern trend toward "'modified' *Allen* charges that do not contrast the majority and minority positions." *Spears*, 459 F.3d at 204 n.4. Neither the Government nor the Defendants contest that the district court gave a "modified" *Allen* charge, rather than the traditional *Allen* charge, in this case. A "modified" *Allen* charge is already a less explosive version of the "dynamite" *Allen* charge, and therefore carries with it a lesser threat of coercing jurors to abandon their conscientious beliefs. *Id.*

Moreover, the district court's *Allen* charge contained all of the safeguards, and none of the pitfalls, that we have previously recognized as relevant to an assessment of its propriety. For instance, "we generally expect that a trial judge using an *Allen*-type supplemental charge will . . . both urge jurors to try to

convince each other and remind jurors to adhere to their conscientiously held views." *United States v. McDonald*, 759 F.3d 220, 225 (2d Cir. 2014). The district court did just that: "repeatedly warn[ing] the jurors not to surrender their conscientiously held beliefs, which is an instruction we have previously held to mitigate greatly a charge's potential coercive effect." *Vargas-Cordon*, 733 F.3d at 378. Moreover, the district court did not inform the jury that it was *required* to reach an agreement; it did just the opposite. *See* J.A. 1358 ("[I]t is your right to fail to agree."). It thereby avoided the "incorrect and coercive" impression that "the only just result was a verdict." *Haynes*, 729 F.3d at 194; *see also id.* at 192–94 (holding that an *Allen* charge was impermissibly coercive where the court stated that it "believe[d]" that the jury would "arrive at a just verdict on Monday") (internal quotation marks omitted).

The Defendants claim that the district court's *Allen* charge was improper because it failed to reinstruct the jury on the burden of proof. We note first that while the court did not mention the burden of proof specifically in its *Allen* charge, it did remind the jury to "follow all the instructions" it had "[previously] given," referencing the written jury instructions that the jury had on hand, which themselves recited the burden of proof. J.A. 1358. Moreover, this factor, on its

44

own, is not dispositive proof of coercion. *See Vargas-Cordon*, 733 F.3d at 377. The district court's *Allen* charge encouraged the members of the jury to continue deliberating on the deadlocked counts to see if a verdict could be reached without coercing them into abandoning their consciously held beliefs regarding the Defendants' guilt or innocence. As such, it resembles other *Allen* charges we have previously approved and its issuance was not an abuse of discretion.

**IV.**

Finally, the Defendants argue the district court acted improperly in ordering Lillemoe and Calderon to pay $18,807,096.33 in restitution with respect to five GSM-102 loans on which the Russian Bank, IIB, defaulted. This sum included $18,501,353 to be paid to the USDA, which had reimbursed CoBank and Deutsche Bank for 98% of their losses on these transactions, *see* 18 U.S.C. § 3664(j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation."), and $304,743.33 to be paid to CoBank, which included $137,422 for losses associated with the transactions and $168,321.33 for costs and attorneys' fees incurred in connection with the investigation and prosecution of the case, *see id.* § 3663A(b)(4) (authorizing

45

reimbursement of "the victim for . . . expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense").[8] We review a district court's order of restitution for abuse of discretion. *United States v. Pearson*, 570 F.3d 480, 486 (2d Cir. 2009). "A court abuses its discretion when it rests its decision on an error of law." *United States v. Archer*, 671 F.3d 149, 169 (2d Cir. 2011).

"The Mandatory Victims Restitution Act ('MVRA'), 18 U.S.C. § 3663A, is one of several federal statutes empowering courts to impose restitution obligations on criminal defendants." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015). Under the MVRA, in the case of an "offense resulting in . . . loss or destruction of property," the court shall "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *See* 18 U.S.C. §§ 3663A(b)(1), 3664(f)(1)(A). Where intended loss is incorporated to punish a culpable defendant, "restitution is designed to make the victim whole . . . and must therefore be based only on the actual loss caused by the scheme." *United States v.*

---

[8] The Court also ordered forfeiture in the amount of $1,543,287.60 from Lillemoe and $63,509.97 from Calderon. The Defendants do not challenge the forfeiture amount.

46

*Lacey*, 699 F.3d 710, 721 (2d Cir. 2012) (citation omitted).

The Defendants argue that the district court's order was improper because CoBank and Deutsche Bank do not qualify as "victims" under the Act.[9] A "victim" for the purposes of the MVRA is "a person *directly and proximately harmed* as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2) (emphasis added). To qualify as a "victim," then, a party must have endured a financial loss that was "directly and proximately" *caused* by a defendant's fraud. *See United States v. Paul*, 634 F.3d 668, 676 (2d Cir. 2011) ("In determining the proper amount of restitution, a court must keep in mind that the loss must be the result of the fraud." (internal quotation marks, brackets, and citation omitted)).

"[P]roximate cause, as distinct from actual cause or cause in fact" (commonly labeled "but-for" causation) is a "flexible concept" that "defies easy summary." *Paroline v. United States*, 572 U.S. 434, 444 (2014) (internal quotation marks and citation omitted); *see also CSX Transp., Inc. v. McBride*, 564 U.S. 685, 701 (2011) (labeling proximate cause "a term notoriously confusing"). "Proximate

---

[9] The Government bears the burden of establishing by a preponderance of the evidence that each individual it claims is entitled to restitution was actually a "victim." *Archer*, 671 F.3d at 173.

cause" is in essence a "shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp.*, 564 U.S. at 692. The central goal of a proximate cause requirement is to limit the defendant's liability to the kinds of harms he risked by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct created, it would be unjust or impractical to impose liability. *See* Prosser & Keeton, The Law of Torts 281 (5th ed. 1984).

We have accordingly viewed the MVRA's proximate cause requirement as a "tool[]" to both "limit a person's responsibility for the consequences of that person's own acts" and to promote efficiency in the sentencing process. *United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2006).[10] When interpreting the MVRA, we have clarified that "a misstatement or omission" is the "proximate cause" of an investment loss for the purposes of imposing restitution, "if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *United States v. Marino*, 654 F.3d 310, 321 (2d Cir. 2011) (internal quotation marks and citation omitted). The

---

[10] The Supreme Court has indicated that the definition of "proximate cause" may vary depending on the statute in question. *See CSX Transp.*, 564 U.S. at 700 (recognizing a unique test for "proximate causation applicable in FELA suits").

48

MVRA's proximate causation requirement is therefore "akin to the well-established requirement that there be 'loss causation' in securities-fraud cases and not merely transaction ('but-for') causation." *Archer*, 671 F.3d at 171 n.16; *see also Marino*, 654 F.3d at 321 (equating "proximate causation" under the MVRA to "loss causation" in the securities context). And to establish loss causation, "a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation marks, ellipses, and citation omitted).[11]

Given the above standard, we are confident that the banks do not qualify as "victims" under the MVRA because the Defendants did not proximately cause their losses. As catalogued above, the Defendants fraudulently altered shipping documents in order to make them facially compliant with the relevant letters of credit. Their fraud concealed two risks from the domestic banks: (1) that the issuing (foreign) banks would refuse to honor the letters of credit on the ground that the domestic banks had failed to demand a valid, conforming presentation;

---

[11] To take one example from the securities context, in *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489 (2d Cir. 1992), we dismissed a civil claim asserting violations of securities laws where the complaint alleged that a fraud "induced" the plaintiff to enter into a transaction but failed to allege facts supporting a "causal connection between the fraud alleged and the subsequent loss that it suffered." *Id.* at 1492, 1495.

and (2) that the USDA would decline to reimburse the banks for their losses because the transactions were not compliant with the GSM-102 program requirements. *See supra* Part I.B. Neither of these risks even arguably materialized. Instead, the foreign banks defaulted on their obligations due to their financial inability to fulfill them following a global financial crisis. The fraudulent shipping documents had no bearing whatsoever on the foreign banks' potential to default in such circumstances, which is the risk that actually materialized here.

This case is thus distinct from those contexts where we have found that a defendant's fraud "proximately caused" an injury for purposes of the MVRA. To take one example, in *Paul*, the defendant artificially inflated the value of his stock holdings in order to secure a loan. 634 F.3d at 670. Once his scheme was discovered, the price of those holdings plummeted, and he was unable to repay his loans. *Id*. We concluded that the defendant's fraud "proximately caused" his lenders' losses (and that they were therefore "victims" under the MVRA entitled to restitution equaling the full amount of the loan) because his misrepresentations bore directly on "the making of the loans in the first instance," even if "market forces may have contributed to the decline in" the value of the

50

collateral. *Id.* at 677–78. Put differently, because Paul misrepresented his own creditworthiness, his financial inability to repay his loans was quite clearly within the zone of risk concealed by his fraud.[12]

Here, by contrast, the Defendants' misrepresentations were not even arguably related to CoBank's and Deutsche Bank's assessment of the foreign banks' *creditworthiness*. We can say this with complete certainty because *before* the Defendants presented the fraudulent documents to the confirming banks, the USDA and the banks had *pre-approved* the relevant foreign banks for participation in these transactions. This pre-approval process included the foreign banks' submission of three years of audited financial statements, and a "rigorous" independent analysis spearheaded by the USDA's Risk and Asset Management branch that could take "six or seven months" to complete. J.A. 595; *see also* S.A. 11 (the district court noting that the bank made its determination as to the foreign

---

[12] Thus, if the Defendants here had, say, misrepresented the value of collateral held by the foreign banks and those banks had then defaulted on their loans, we would not hesitate to conclude that they "proximately caused" the banks' losses, even if the banks' ability to repay the loans was also affected by market forces. *Cf. United States v. Turk*, 626 F.3d 743, 748–51 (2d Cir. 2010) (affirming the district court's loss calculation as to the total value of a loan where the defendant lied to lenders as to whether they were secured creditors and never repaid them their principal).

banks' likelihood of default "before any of the altered documents were presented").

The Government argues that the banks would not have gone through with the transactions without the Defendants' involvement, and therefore that the Defendants proximately caused the banks' losses on those transactions. This argument confuses "but-for" causation with proximate causation. To take one analogous example from the securities context, in *Bennett v. United States Trust Co.*, 770 F.2d 308 (2d Cir. 1985), the plaintiffs "went to [a bank] with the idea of borrowing money to purchase public utility stock already in mind" when that bank misinformed them that the Federal Reserve's "margin rules" did not apply to their intended stock purchases. *Id.* at 313–14. The bank's error allowed the plaintiffs to borrow money to purchase the stock, but when the market value of the stock subsequently decreased, the plaintiffs were unable to repay their loans. *Id.* at 310. We held that even if the bank's misrepresentation regarding the margin requirements was a "but-for" cause of the plaintiffs' investment, the plaintiffs had still failed to plead loss causation because "the loss at issue was caused by the [plaintiffs'] own unwise investment decisions, not by [the bank's] misrepresentation." *Id.* at 314. Similarly, here, the Defendants presented

fraudulent documents to the confirming banks *after* those Banks had *already* decided to offer loans to the relevant foreign banks pursuant to comprehensive financial analyses conducted by the confirming banks and the USDA. That financial decision—to offer the foreign loans—was not influenced by the Defendants' misconduct.

The MVRA provides redress to the victims of fraud, but it does not supply a windfall for those who independently enter into risky financial enterprises through no fault of the fraudsters. As we stated in *Archer*: "[I]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purposes of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171. The domestic banks here made a bet that the foreign banks would be able to repay the relevant loans with interest, and their assessments as to the advisability of *that* bet were completely unrelated to the risks concealed by the Defendants' fraud. The banks therefore do not qualify as "victims" under the MVRA and the district court erred in finding to the contrary. Accordingly, neither the USDA nor the banks are entitled to any restitution for losses caused by participation in the transaction

or for expenses incurred during participation in the investigation, prosecution, or related proceedings. The entire restitution award must be reversed.

## CONCLUSION

We have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, we AFFIRM the district court's judgments of conviction but REVERSE the restitution orders. We REMAND the case with instructions that the judgments be amended to omit that portion stating that the defendant must pay restitution.